In re THE BENNETT FUNDING GROUP, INC., Debtor.

Marine Midland Bank, Plaintiff–Appellee Plaintiff–Cross Appellant,

v.

Richard C. Breeden, Trustee and the Official Committee of Unsecured Creditors, Respondents–Appellants Respondents–Cross–Appellees,

The Ohio Bank, f/k/a American Community Bank, N.A. and Mid Am Bank f/k/a First National Bank Northwest Ohio, Amici Curiae.

Stoneham Savings Bank, Plaintiff–Appellee Plaintiff–Cross Appellant,

v.

Richard C. Breeden, Trustee and the Official Committee of Unsecured Creditors, Respondents–Appellants Respondents–Cross–Appellees.

ESB Bank, FSB, Plaintiff–Appellee Plaintiff–Cross Appellant,

v.

Richard C. Breeden, Trustee and the Official Committee of Unsecured Creditors, Respondents–Appellants Respondents–Cross–Appellees.

American State Bank & Trust Company of Williston, Plaintiff–Appellee Plaintiff–Cross Appellant,

v.

Richard C. Breeden, Trustee and the Official Committee of Unsecured Creditors, Respondents–Appellants Respondents–Cross–Appellees.

First State Bank of Wabasha, Plaintiff–Appellee Plaintiff–Cross Appellant,

v.

Richard C. Breeden, Trustee and the Official Committee of Unsecured Creditors, Respondents–Appellants Respondents–Cross–Appellees.

La Crescent State Bank, Plaintiff–
Appellee Plaintiff–Cross
Appellant,

v.

Richard C. Breeden, Trustee and the
Official Committee of Unsecured
Creditors, Respondents–Appellants
Respondents–Cross–Appellees.

Wilber National Bank, Plaintiff–
Appellee Plaintiff–Cross
Appellant,

v.

Richard C. Breeden, Trustee and the
Official Committee of Unsecured
Creditors, Respondents–Appellants
Respondents–Cross–Appellees.

Mid Am Bank f/k/a American Commu-
nity Bank, N.A., Plaintiff–Appellee
Plaintiff–Cross Appellant,

v.

Richard C. Breeden, Trustee and the
Official Committee of Unsecured
Creditors, Respondents–Appellants
Respondents–Cross–Appellees.

The Ohio Bank, f/k/a First National
Bank Northwest Ohio, Plaintiff–Ap-
pellee Plaintiff–Cross Appellant,

v.

Richard C. Breeden, Trustee and the
Official Committee of Unsecured
Creditors, Respondents–Appellants
Respondents–Cross–Appellees.

Citrus Bank, Plaintiff–Appellee
Plaintiff–Cross Appellant,

v.

Richard C. Breeden, Trustee and the
Official Committee of Unsecured
Creditors, Respondents–Appellants
Respondents–Cross–Appellees.

First National Bank of Carmi, Individu-
ally and as Agent, Bank of Utica, the
Commercial Bank, Amocore Bank,
N.A., Rockford, Security Bank, Story
County Bank & Trust, First Federal
Savings & Loan of Galion, Norwest

Bank of Redwing, N.A., American
Trust Federal Savings Bank, Minneso-
ta Valley Bank, Farmers State Bank,
First Community Bank, FSB, First
United Security Bank, Union State
Bank, the Howard Bank, N.A., Mer-
chants National Bank of Winona,
Sprague National Bank, Oxford Bank
& Trust, Tucker Federal Savings &
Loan Assoc., Gloucester Bank & Trust
Company, State Bank & Trust of Se-
guin, and Metrobank, Movants–Appel-
lees Movants–Cross Appellants,

v.

Richard C. Breeden, Trustee and the
Official Committee of Unsecured
Creditors, Respondents–Appellants
Respondents–Cross–Appellees.

Nos. 61376, 97–50047L, 97–50048CON, 97–
CV–1377RSP, 97–CV–1671RSP–97–
CV–1673RSP, 97–CV–1674TJM, 97–
CV–1675TJM, 97–CV–1705TJM, 97–
CV–1838RSP–97–CV–1840RSP, 98–
CV–96LEK–98–CV–98LEK, 98–CV–
476FJS–98–CV–478FJS, 98–CV–
613RSP–98–CV–615RSP, 98–CV–
279TJM–98–CV–281TJM, 98–CV–
251RSP–98–CV–253RSP, 97–CV–
1669FJS, 97–CV–1670FJS, 97–CV–
1752FJS, 98–CV–1330TJM, 98–CV–
1317TJM–98–CV–1329TJM, 98–CV–
1331TJM–98–CV–1340TJM.

United States District Court,
N.D. New York.

Nov. 29, 2000.

622

*Memorandum—Decision and Order*

KAHN, District Judge.

Presently before the Court are bankruptcy appeals and cross-appeals from various decisions the Honorable Stephen D. Gerling, Chief United States Bankruptcy Judge, issued in relation to the Bennett Funding Group's Chapter 11 case by Marine Midland Bank, Stoneham Savings Bank, ESB Bank, F.S.B., American State Bank & Trust Company of Williston, First State Bank of Wabasha, La Crescent State Bank, Wilber National, Mid Am Bank, Ohio Bank, Citrus Bank, First National Bank of Carmi, Bank of Utica, the Commercial Bank, Amcore Bank N.A., Rockford Security Bank, Story County Bank Trust, First Federal Savings & Loan of Galion, Norwest Bank of Redwing, American Trust Federal Savings Bank, Minnesota Valley Bank, Farmers State Bank, First Community Bank, Union State Bank, Howard Bank, Merchants National Bank of Winona, Sprague National Bank, Oxford Bank & Trust, Tucker Federal Savings & Loan Assoc., Gloucester Bank & Trust of Seguin, State Bank & Trust of Seguin, and Metrobank (collectively "Banks"). Also before the Court are various appeals and cross appeals from these same decisions by Richard C. Breeden, the Trustee ("Trustee"), and the Official Committee of Unsecured Creditors ("OCUS").[1]

## I. Factual Background

This series of appeals arises out of one of the largest bankruptcy cases ever brought in this District. The debtors, Bennet Funding Group ("BFG"), are a series of financial and investment institutions formerly controlled by the Bennett family of Syracuse, New York. BFG's primary business was the multilateral leasing of office equipment.

In a typical transaction BFG, would purchase office equipment from a vendor. The vendor would deliver the equipment to an end-user who would promise to make periodic lease payments to BFG. BFG would then pledge or assign its lease in the underlying equipment or lease proceeds to other investors in exchange for cash. BFG obtained its profit because of the interest rate spread between the rates an end-user paid on the lease and the effective interest rate paid to the investors. Alternatively, BFG sometimes assembled multiple leases into aggregate portfolios and then pledged these portfolios to institutional investors in exchange for cash.

As BFG struggled to maintain liquidity, it allegedly began pledging and re-pledging multiple and fictitious leases to various investors. In the spring of 1996, BFG proved unable to maintain its liquidity and it filed for Chapter 11 protection. On April 18, 1996, Richard C. Breeden, a former chairman of the Securities and Exchange Commission, was appointed Chapter 11 Trustee of BFG's assets.

At the outset of the bankruptcy case, approximately 245 banks claimed to have perfected security interests in the office equipment and leases that comprised a large portion of the assets in BFG's bankruptcy estate. The Trustee reached Bankruptcy Court-approved settlements with slightly over 200 of these banks. The remaining banks, the appellees, have not been able to reach any settlement with the Trustee and have sought to lift the automatic stay imposed by section 362(a) of the Bankruptcy Code. Each has asserted claims on unpaid principal and assets totaling approximately $62 million.

1. As the Trustee and the OCUS are situated on the same side of this appeal, the two are referenced throughout this opinion as the

"Trustee" and arguments raised by either are cited to the Trustee except where noted.

## II. Procedural Background

### A. UCC Decision

The Banks' attempt to lift the automatic stay resulted in a status conference in July of 1996 and a series of eleven evidentiary hearings before the Bankruptcy Court in the spring and summer of 1997. In October of 1996, the Bankruptcy Court rendered the first decision that is, in part, the subject of this appeal. *See In re the Bennett Funding Group, Inc.*, 203 B.R. 30 (Bankr.N.D.N.Y.1996) (hereinafter "UCC"). In that decision the Bankruptcy Court concluded, in relevant part, that financing statements that identified BFG as "Aloha Leasing, a Div. of The Bennett Funding Group, Inc." were sufficient to perfect the Banks' security interest in the underlying leases and lease payments. *See id.* at 37–38.

The rationale underpinning this conclusion rested upon the Bankruptcy Court's belief that "whether the trade name precedes or follows the legal name of the debtor should not make a difference, particularly in this age of computer indexing." *UCC*, 203 B.R. at 37. The Bankruptcy Court stated further that its decision "unless reversed on appeal, shall constitute the 'law of the case,' and the legal determination made herein controls if and when the same question again presents itself by other parties similarly situated." *Id.* at 32 n. 1.

### B. Marine Midland I and Wilber I Decisions

After the UCC Decision was issued the Bankruptcy Court conducted two hearings involving Marine Midland and Wilber National Banks that resulted in two nearly identical decisions. *See In re Bennett Funding Group, Inc.*, Case No. 96–61376, Adv. Proc. 96–70061A, slip op. (Bankr. N.D.N.Y. May 30, 1997) (hereinafter "Marine Midland I"); *In re Bennett Funding Group, Inc.*, Case No. 96–61376, Adv. Proc. 96–70064A, slip op. (Bankr. N.D.N.Y. June 4, 1997) (hereinafter "Wilber I").

In Marine Midland I and Wilber I, Judge Gerling ruled that "there are two types of collateral in which [the bank] asserts it has a security interest, namely chattel paper and the proceeds derived therefrom." *Marine Midland I*, slip op. at 24. He further held that the banks had perfected their security interests in the chattel paper because they had maintained possession of them. *See id.* at 31. However, he reconsidered his earlier conclusion that the UCC–1 statements identifying the debtor as "Aloha Leasing, a Div. of the Bennett Funding Group, Inc." were valid. *Id.* at 34.

In essence the Bankruptcy Court held that, because the filing statement listed "Aloha Leasing, a Div. Of the Bennett Funding Group, Inc." as the debtor, a diligent creditor searching for liens against BFG would not be placed on notice as to the existence of the liens. *See id.* Finally, Judge Gerling held, that although the Banks had perfected their security interests in the underlying chattel paper by possession, they had not perfected any security interest in post-petition payments flowing from the chattel paper because the banks had neither filed a sufficient UCC–1 financing statement nor taken possession of the post-petition payments as required by NYUCC § 9–306(3). *See id.* at 35–37.

### C. Marine Midland II and Wilber II Decisions

The Banks moved for reconsideration of Marine Midland I and Wilber I on the grounds that they had in fact perfected their security interest in post-petition lease payments pursuant to NYUCC § 9–306(3)(c) and § 546(b) of the Bankruptcy Code. *See Marine Midland Bank v. The Bennett Funding Group, Inc.*, No. 96–61376, Adv. Proc. 96–70061A, slip op. (Bankr.N.D.N.Y. Aug. 11, 1997) (hereinafter "Marine Midland II"); *Wilber National Bank v. The Bennett Funding Group Inc.*, No. 96–61376, Adv. Proc. 96–70064A, slip op. (Bankr.N.D.N.Y. March 28, 1998)

(hereinafter "Wilber II"). Accepting this argument, Judge Gerling reconsidered his earlier decisions and held that the Banks had perfected security interest in both the underlying chattel paper and identifiable post-petition payments flowing from it. *See Marine Midland II,* slip op. at 51. At the same time he ruled that the Banks had failed to provide any evidence to indicate that payments received prior to April 19, 1996 were identifiable.[2] *See id.* As such they were not entitled to any payments made before this date.[3]

### D. Carmi Decision

In late 1997, twenty-two banks entered into a stipulation with the Trustee for a consolidated hearing on their motions for relief from the automatic stay. *See* Stipulation Regarding Lift–Stay Litigation by Bank of Carmi and Banks Identified Below That Have Not Yet Had Evidentiary Hearings Regarding Transactions with the Bennett Funding Group, Inc. ("BFG"), dated September 25, 1997 and approved by Order dated October 17, 1997. The Bankruptcy Court ruled on the issues raised in the consolidated hearing in a 100 page decision issued on May 6, 1998. *See In re Bennett Funding Group,* No. 96–61376, slip op. (Bankr.N.D.N.Y. May 6, 1998) (hereinafter "Carmi"). In it, Judge Gerling largely restated and expanded his analysis in Marine Midland II and Wilber II. Both the Banks and the Trustee (along with OCUS) appealed various aspects of these decisions to this Court.[4] The Court will address each of the issues raised in turn.

### III. Discussion

### A. Standard of Review

■ When a district reviews a Bankruptcy Court's finding of fact, it uses the clearly erroneous standard. *See* Fed. R. Bankr.P. 8013; *Shugrue v. Air Line Pilots Ass'n Int'l (In re Ionosphere Clubs, Inc.),* 922 F.2d 984, 988 (2d Cir.1990). A finding of fact is "clearly erroneous when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite conviction that a mistake has been committed." *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948). As long as the Bankruptcy Court's findings are "plausible in light of the evidence viewed in its entirety," this Court cannot reverse simply because it might have reached a different conclusion were it the trier of fact. *See Anderson v. City of Bessemer City, N.C.,* 470 U.S. 564, 574, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985).

■ A Federal District Court reviewing a Bankruptcy Court's conclusions of law uses the more lenient de novo standard. *See Shugrue,* 922 F.2d at 988; *In re Colony Hill Assoc.,* 111 F.3d 269, 273 (2d Cir. 1997). Under this standard, the District Court places itself in the same position as the Bankruptcy Court and has plenary power to affirm or reverse its conclusions of law. *See In re Manville Forest Products Corp.,* 209 F.3d 125, 127 (2d Cir.2000).

### B. Banks' Perfection of Security Interests by Virtue of Filing UCC–1 Statements

A central issue in this appeal is whether the Bankruptcy Court was correct in concluding that the UCC–1 statements the Banks filed with the Onondaga County Clerk were invalid. As the answer to this question requires this Court to address

---

**2.** On this date the Bankruptcy Court's Segregation Order requiring the Trustee to deposit all lease proceeds into segregated accounts became effective.

**3.** Following the Marine Midland II and Wilber II decisions, the Bankruptcy Court issued identical decisions with respect to 9 other appellees.

**4.** In this decision, the Bankruptcy Court referenced an additional Segregation Order issued on June 11, 1996. As in prior decisions, the Court concluded that the lease payments subject to the Order were not identifiable prior to the Order's issuance.

findings of fact and conclusions of law, this Court will apply the clearly erroneous standard to disputed findings of fact and the de-novo standard to disputed conclusions of law.

### 1. *UCC-1 Filing Requirements*

With certain exceptions not applicable here, a creditor perfects a security interest in underlying collateral after filing a financing statement with the "department of state and in addition, if the debtor has a place of business in this state and in only one county of this state, also in the office of the filing officer of such county." NYUCC § 9–401(1)(c). Generally, a financing statement is sufficient if it provides the "names of the debtor and the secured party, is signed by the debtor, gives an address of the secured party, ... a mailing address of the debtor and contains a statement indicating the types, or describing the items of collateral." NYUCC § 9–402(1). The purpose of these requirements is to protect present and prospective creditors who would not know, but for record of the liens, whether the debtor's property is encumbered. *See Cherno v. Dutch American Mercantile Corp.*, 353 F.2d 147, 152 (2d Cir.1965).

■ As such, minor mistakes on a financing statement do not typically invalidate a security interest unless those mistakes seriously mislead a potential creditor. *See* NYUCC § 9–402(8); *First Manufactured Housing Credit Corp. v. Clarkson Mobile Home Park, Inc.*, 148 A.D.2d 901, 902, 539 N.Y.S.2d 529 (1989). Moreover, a financing statement is not seriously misleading as long as "it sufficiently shows the name of the debtor." NYUCC § 9–402(7). A financing statement sufficiently shows the name of the debtor "if it gives the individual, partnership or corporate name of the debtor, whether or not it adds other trade names or the names of partners." *Id.*

In this case, the Banks filed UCC–1 statements with both the department of state and the Onondaga County Clerk's office. Both sets of statements identified the debtor as "Aloha Leasing, a div. of the Bennett Funding Group, Inc." The Bankruptcy Court found that because the Onondaga County Clerk indexed the UCC–1 statements under Aloha Leasing,[5] and not BFG, the statements did not place a creditor on notice as to the existence any interests against BFG. *See Carmi,* slip op. at 25–26. Therefore, they were seriously misleading. *See id.* at 27.[6]

### 2. *Merits of Claim*

■ The Bankruptcy Court's holding that the financing statements were misleading was based in large part on the fact that the Onondaga County Clerk's office did not use full text indexing at the time the financing statements were filed. *See id.* at 26 (stating that "[i]f Onondaga County had utilized a system which permitted a search of the full text of BFG's name, the Court's prior conclusions with respect to the inclusion of the Debtor's trade name would have had merit"). This reliance was however misplaced. It is the Bankruptcy Court's job to determine whether the filing is seriously misleading in light of the legal principals outlined in this and other court's decisions.

To allow otherwise means a Bankruptcy Court using 20–20 hindsight can disrupt the uniform filing system the UCC was designed to create. For example, allowing the Court to examine the nuances of a particular county office's computer indexing system instead of the creditor's compliance with the strict terms of the statute creates a situation where two identical statements filed in different offices are held to different standards.

---

5. Aloha Leasing is a trade name of BFG.

6. Conversely, the Bankruptcy Court accepted as valid the financing statements filed with the Secretary of State.

The inevitable result is that one statement is held valid because one office uses one type of indexing system while the same statement filed in a different office is held invalid because of the different office's use of an alternative indexing system. Consequently, the Bankruptcy Court was in error to rely upon indexing evidence at the Onondaga County Clerk's office to conclude that the UCC–1's filed there were invalid. *See In re Atlas Technologies, Inc.*, 78 B.R. 394, 400 (E.D.N.Y. 1987) (stating that it was error for the Bankruptcy Court to consider whether the "County Clerk actually indexed Citicorp's financing statement Atlas's name").

This does not end this Court's inquiry. Instead, it must make a de-novo determination whether the financing statements, as written, satisfy the requirements of the UCC. This requires the Court to interpret various provisions of the UCC, giving effect, if possible, to each. *See Reiter v. Sonotone Corp.*, 442 U.S. 330, 339, 99 S.Ct. 2326, 60 L.Ed.2d 931 (1979).

The Banks and Trustee point to three conflicting provisions of the UCC that bear on the issue of whether the challenged financing statements are valid. The first of these provisions states that a financing statement sufficiently shows the name of the debtor "whether or not it adds other trade names or the names of partners." NYUCC § 9–402(7). The second declares that a minor mistake does not invalidate a security interest unless the mistake seriously misleads a potential creditor. *See* NYUCC § 9–402(8). The third declares that the uniform filing fee for any statement shall be three dollars plus seventy five cents for any "additional person, firm or organization, beyond the first, named as a debtor." NYUCC § 9–403(5)(c).

The Banks argue that because they correctly listed Aloha as a division of the Bennett Funding Group as allowed under the UCC, they complied with the literal terms of the statute and their financing statements are valid. Conversely, the Trustee argues that placement of the name Aloha Leasing before the Bennett Funding Group is seriously misleading in light of the UCC's requirement that an additional seventy five cent fee be paid for additional debtors, beyond the first, listed on the financing statement and the county clerk's responsibility to index the financing statement under the first name appearing on the statement.

The Trustee argues that the Banks have no right to assume that the Onondaga County Clerk will gratuitously cross-index the financing statements when the statute itself declares that they must pay an additional seventy-five cent fee to cross index them. In sum, the Trustee points out that such an assumption renders UCC § 9–403(5)(c) superfluous.

■ This Court agrees. The insertion of a trade name in a UCC financing statement does not itself render that statement misleading. However, because a county clerk is required to file the effective financing statement under the first name appearing on it,[7] when the insertion of a trade name is placed before the actual debtor's name, creditors will not have notice of any claim against the debtor unless the filing party affirmatively utilizes the cross-indexing mechanism available to it under UCC § 9–403(5)(c). *See Maremont Mktg., Inc. v. Centennial Indus., Inc.*, 3 B.R. 416, 417 n. 1 (Bankr.S.D.N.Y.1980).

■ As a result, the Banks were left with two choices. They could have paid the additional seventy five cent filing fee to ensure that both names were properly listed with the Onondaga County Clerk's office. Failing to do that, they should have placed the debtor's legal name before its

---

**7.** *See* NYUCC § 9–403(5)(c); *John Deere Co. v. Pahl Constr. Co.*, 34 A.D.2d 85, 310 N.Y.S.2d 945, 949 (4th Dep't 1970)(stating that "[a]s a ministerial officer [the county clerk] was required to index the statement under the name he found in it and not ... engage 'in some second guessing' ")

trade name on each of the filed UCC–1's.[8] This Court therefore affirms, for different reasons, the Bankruptcy Court's ruling that the UCC–1 statements listing the debtor's trade name before the debtor's legal name were seriously misleading in light of the fact that the Banks did not pay the additional cross-indexing fee required under UCC § 9–403(5)(c).[9]

### 3. *Debtor's Second Place of Business and Evidentiary Hearings*

The Trustee asserts on appeal that the Bankruptcy Court was in error in concluding that financing statements filed for the 21 month period from December 1, 1992—August 31, 1994 were valid. The Trustee argues that the Bankruptcy Court erroneously determined that BFG maintained a second place of business in New York. If the trustee is correct, the Banks could not rely on their filings with the Secretary of State to uphold their security interests. Rather the Banks had to file proper filing statements with the secretary of state and the Onondaga County Clerk. Because this Court has already concluded that the UCC–1 financing statements filed with the Secretary of State and the Onondaga County Clerk under the name "Aloha Leasing, a Div. Of the Bennett Funding Group, Inc." are invalid it need not address the merits of this argument.

In a related but separate argument, the Banks argue that the Bankruptcy Court improperly denied their request to reopen already closed evidentiary hearings in order to provide additional evidence concerning the indexing procedures used by the Onondaga County Clerk's office and the Secretary of State. Additionally, the Banks argue the Bankruptcy Court was in error for declining their request to reopen evidentiary hearings pertaining to the Debtor's second place of business. As this Court has ruled as matter of law that it was error for the Bankruptcy Court to rely upon any evidence regarding the indexing procedures at the Onondaga County clerk's office, this portion of the appeal is now moot and will not be addressed. Moreover, because the UCC–1 financing statements listing the debtor as "Aloha Leasing, a Div. Of the Bennett Funding Group, Inc." and filed with the Secretary of State and the Onondaga County Clerk's office, were invalid as a matter of law, there is no need to address whether evidentiary hearings regarding the debtor's second place of business need to be reopened.

### 4. *Changing of Law of the Case from UCC Decision*

On appeal the Banks argue that they were considerably surprised and prejudiced by the Bankruptcy Court's decision to overrule its earlier finding that all financing statements signed as "Aloha Leasing, a Div. Of the Bennett Funding Group, Inc." were presumptively valid. *See UCC*, 203 B.R. at 36. According to the Banks, the Bankruptcy Court's reconsideration of its earlier findings on the validity of the

---

**8.** To the extent that *In re Atlas Technologies, Inc.* contradicts this holding, this Court respectfully disagrees and, in any event, is not bound by it.

**9.** The Trustee in this appeal also argues that the Bankruptcy Court was in error for not holding the UCC–1 financing statements filed with the Department of State invalid. As the underlying validity of either set of filing statements turn on the same set of facts and issues, this Court's holding applies to both sets of statements. For reasons already discussed, it would be incongruous and undermine the UCC's policy of uniformity for this Court to accept the validity of one set of statements filed in one office but reject the very same filing in another office because of the computer system utilized in the other office. *See, e.g., In re Mines Tire Co., Inc.*, 194 B.R. 23, 26 (Bankr.W.D.N.Y.1996) (stating that regardless of the availability of computers, the "indexed name should have sufficed to enable a manual searcher to locate a security interest."). Accordingly, to the extent that the Bankruptcy Court found that the UCC–1 statements filed with the Secretary of State were valid or that the Trustee waived the ability to contest that issue, those findings were clearly erroneous and are overruled.

UCC–1s violated the law of the case doctrine.

The law of the case doctrine holds, in relevant part, that once a court has ruled on an issue, " 'that decision should generally be adhered to by that court in subsequent stages in the same case.' " *Prisco v. A & D Carting Corp.*, 168 F.3d 593, 607 (2d Cir.1999) (quoting *United States v. Uccio*, 940 F.2d 753, 758 (2d Cir.1991)); *see Agostini v. Chancellor, Bd. of Ed. of City of New York*, 521 U.S. 203, 236, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997). However, this rule is not absolute and " 'is, at best, a discretionary doctrine, which does not constitute a limitation on the court's power but merely expresses a general reluctance, absent good cause, to reopen rulings that parties have relied upon.' " *LNC Investments, Inc. v. First Fidelity Bank, N.A. New Jersey*, 173 F.3d 454, 467 (2d Cir.1999) (quoting *Tischmann v. ITT/Sheraton Corp.*, 145 F.3d 561, 564 (2d Cir.1998)); *see Prisco*, 168 F.3d at 607. In deciding whether or not to apply law-of-the-case, courts are " 'informed principally by the concern that disregard of an earlier ruling not be allowed to prejudice the party seeking benefit of the doctrine.' " *Id.* (quoting *Uccio*, 940 F.2d at 758).

In the instant case, the lower court departed from its prior ruling to correct an error of law. This Circuit has long recognized the validity of this reason for a court to change a prior ruling. *See Prisco*, 168 F.3d at 607. Nevertheless, the Banks contend that they suffered prejudice because they relied on the UCC Decision in failing to provide additional proof of perfection of their security interests.

However, as discussed above, this Court has already held that the Banks' UCC–1

filing statements were invalid on their face as a matter of law. No offer of evidence by the Banks can effect that decision. Accordingly, the Banks have suffered no prejudice as a result of the Bankruptcy Courts' reconsideration of the UCC Decision and its determination will not be disturbed.

**C. Banks' Perfection of Security Interests Leases by Virtue of Possession under 11 U.S.C. § 546**

A second major issue in this appeal is whether the Bankruptcy Court correctly ruled that the Banks perfected their security interests in the underlying leases and post-petition lease payments because of their possession of the underlying leases. Since construction of this portion of the Bankruptcy Code and the relevant sections of the UCC are matters of law, this Court will review the Bankruptcy Court's findings de-novo.

*1. Requirements to Perfect by Possession*

As the Bankruptcy Court correctly found, there are two types of collateral in which the Banks are asserting they have a security interest. *See Marine Midland I*, slip op. at 24. The first type of collateral is the underlying chattel paper (i.e. the majority of leases). The second type of collateral is any proceeds derived therefrom.

*a. Chattel Paper Perfection*

The New York UCC allows a creditor to perfect an interest in chattel paper either by filing a proper UCC–1 statement, NYUCC § 9–304(1), or "by the secured party's taking possession of the collateral." NYUCC § 9–305.[10] As the Banks did not

---

**10.** At the outset, this Court notes that a variety of Banks have raised arguments as to which state's law should govern the effect of perfection of their security interests. Given that "the Lease Payments exist, or will exist, in New York where BFG's offices are" located, New York has the most significant interest in having its laws govern the outcome of this

dispute. Accordingly, this Court concludes that under either a federal or state choice of law analysis, New York law governs the various state related claims asserted in this appeal. *See Babcock v. Jackson*, 12 N.Y.2d 473, 484, 240 N.Y.S.2d 743, 191 N.E.2d 279 (1963); *see generally Klaxon Co. v. Stentor*

file proper UCC–1 statements, they had to perfect their interests in the underlying chattel paper by possession. This is not in dispute.

What is in dispute is the effect of this perfection. The Trustee contends that the Banks' perfection by possession of the underlying chattel paper did not grant them any rights to post-petition proceeds flowing from this paper. Conversely, the Banks argue that their perfection by possession of the underlying chattel paper entitled them to an interest in the paper's proceeds. Again, the New York Uniform Commercial Code provides a starting point to analyze the validity of these conflicting claims.

### b. Chattel Paper Proceeds

■ A security interest in proceeds from chattel paper is considered "continuously perfected" as long as the interest in the original collateral is perfected. NYUCC § 9–306(3). As the Banks have a perfected security interest in the underlying chattel paper in their possessions, under the express terms of NYUCC § 9–306(3), they also have a perfected interest in the proceeds flowing therefrom the moment they arise. *See Bremen Bank and Trust Co. v. United States*, 131 F.3d 1259, 1265 (8th Cir.1997); *In re Churchill Mortgage Investment Corp.*, 233 B.R. 61, 70 (Bankr.S.D.N.Y.1999); *In re Keneco Financial Group, Inc.*, 131 B.R. 90, 94 (Bkrtcy.N.D.Ill.1991). Unfortunately for the Banks, this continuously perfected security interest in proceeds becomes unperfected if the proceeds are paid to the debtor and the Banks take no action within ten days of the debtor's receipt to protect their interest. *See* NYUCC § 9–306(3).

Applying these rules to the instant case reveals the core of the current dispute. Post-petition proceeds flowing from the underlying chattel papers are paid directly to the Trustee. As the Trustee acts as the debtor [11] in possession, the Banks had ten days from the Trustee's receipt of these payments to take action to prevent their security interest from expiring. The only possible action the Banks could take to prevent their interest from expiring, absent the filing of additional UCC–1s, was to obtain possession of the proceeds. *See* NYUCC § 9–305. However, the Trustee argues that the automatic stay instituted by the filing of the petition stripped the Banks of their ability to obtain possession of the lease proceeds and thereby prevented them from protecting their already existing security interest.

### c. Bankruptcy Law

#### i. § 552

Generally, the filing of a bankruptcy petition results in an automatic stay of most actions to collect or enforce a claim against a debtor. *See* 11 U.S.C. § 362(a); *Citizens Bank of Maryland v. Strumpf*, 516 U.S. 16, 21, 116 S.Ct. 286, 133 L.Ed.2d 258 (1995). As such, a creditor's right to "create, perfect, or enforce any lien against the property of the estate" is normally foreclosed by the institution of the automatic stay. 11 U.S.C. § 362(a)(3). Moreover, to strengthen the bankruptcy code's broad

*Electric Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941).

**11.** Some of the Banks argue that the trustee is not the "debtor" for purposes of this Court's analysis of their rights under NYUCC § 9–306(3). These Banks argue that because the Trustee holds the lease payments and not the actual "debtor," the ten day notice requirement has not expired and they continue to hold perfected security interests in the proceeds from the lease. This argument is in error. Once a bankruptcy petition is filed, the Trustee assumes all benefits and defenses available to the debtor and acts as the debtor's representative. *See* 11 U.S.C. § 323(a); 11 U.S.C. § 558. As such, the Trustee controls the debtor to such an extent that he is precluded from acting as a bailee or agent of the banks for purposes of protecting the Banks' rights under NYUCC § 9–306(3). *See* UCC § 9–305 Official Comment 2; *Singer Prods. Co. v. First Am. Bank (In re Singer)*, 102 B.R. 912, 924 (Bankr.E.D.N.Y.1989); *Stein v. Rand Constr. Co.*, 400 F.Supp. 944, 948 (S.D.N.Y.1975).

policy of protecting the assets of the estate, any property the estate acquires following its creation "is not subject to any lien resulting from any security agreement entered into by the debtor before the commencement of the case." 11 U.S.C. § 552(a).

There are however exceptions to these rules. Under 11 U.S.C. § 552(b)(1), if a creditor and debtor have a pre-petition security agreement that extends to proceeds, product, offspring, or profits of the underlying collateral, the terms of that agreement under applicable non-bankruptcy law will be enforced.[12] *See* 11 U.S.C. § 552(b)(1). Additionally, a creditor is entitled to take "any action to perfect, maintain, or continue perfection of an interest in property to the extent that the trustee's rights and powers are subject to such perfection under § 546(b) of this title." 11 U.S.C. § 362(b)(3).

Boiled to its essentials, section 552(b)(1) protects the Banks' interest in post-petition lease payments to the extent provided for under New York's Uniform Commercial Code. Under the New York Uniform Commercial Code, the Banks had to take possession of the lease payments within ten days of the Trustee's receipt of such payments in order to maintain their interest in the payments. According to the Trustee, the Banks never took such possession and, in any event, the automatic stay and Trustee's strong-arm powers prevented the Banks from accomplishing this goal.

ii. § 546

■ Section 546 of the Bankruptcy Code places substantive limitations on the operation of both the automatic stay and the Trustee's strong arm powers outlined in section 544. *See* H.R.Rep. No. 95–595,

95th Cong. 1st Sess. 371 (1977); S.Rep. No. 95–989, 95th Cong., 2nd Sess. (1978), U.S.Code Cong. & Admin.News 1978, p. 5787; *Miner Corp. v. Hunters Run Ltd. Partnership (In re Hunters Run Ltd. Partnership)*, 875 F.2d 1425, 1428 (9th Cir. 1989). In relevant part, section 546(b)(1) permits a party to perfect, maintain, or continue a security interest in property as long as the party seeking to perfect, maintain, or continue the interest acquired these rights under applicable law before the date of the petition. *See* 11 U.S.C. § 546(b)(1). Furthermore, section 546(b)(2) provides that if applicable law requires seizure of property to accomplish, maintain or continue perfection of an interest in property, and the property has not been seized before the petition date, the interest is automatically perfected as long as the interest holder gives notice within the time fixed by applicable law for seizure. *See* 11 U.S.C. § 546(b)(2).

■ The Trustee argues that section 546 does not apply to protect any interest of the Bank in post-petition proceeds because section 546 only applies to protect security interests that relate back to a time before the petition arose. In support of this argument the Trustee points to the legislative history of section 546 which states that "if an interest holder ... still has, under applicable non-bankruptcy law, and as of the date of the petition, the opportunity to perfect his interest against an intervening lien holder, then he may perfect his interest against the trustee." Sen. Rep. 95–989, 95th Cong. 2nd Sess. at 86, *reprinted in* 1978 U.S.Code Cong. & Admin.News 5872. As a general policy statement, this Court agrees with the Trustee to the extent he argues that section 546 allows a lien holder to protect

---

**12.** It is clear to this Court, and none of the parties contest, that the payments flowing from the underlying chattel paper are "proceeds" from the underlying collateral in accordance with the terms of section 552(b)(1). *See Vienna Park Properties v. United Postal Savings Assoc. (In re Vienna Park Properties),*

976 F.2d 106, 112 (2d Cir.1992). Additionally, the applicable non-bankruptcy laws that determine the extent to which the Banks' right to collect lease proceeds are protected under section 552(b)(1) are the relevant provisions of the New York Uniform Commercial Code described above.

rights already granted under state law as long as those rights were created prior to the petition. This Court rejects the further implication that because section 546 only protects state law created rights in liens that exist prior to the petition, it also demands that the interest protected relate back to a date before the petition.

As this Circuit has recognized, [t]he relatively narrow purpose of [the section 546(b) ] exception is to "protect in spite of the surprise intervention of [the] bankruptcy petition, those whom State law protects" by allowing them to perfect an interest they obtained before the bankruptcy proceedings began. *Lincoln Savings Bank FSB v. Suffolk County Treasurer (In re Parr Meadows Racing Ass'n, Inc.),* 880 F.2d 1540, 1546 (2d Cir.1989) (citations omitted). This is exactly what the Banks seek to accomplish here. Under NYUCC § 9–306(3)(c) they are entitled to maintain their already perfected interest in post-petition proceeds by seizing them within ten days of their receipt by the debtor. *See* NYUCC § 9–306(c). The Bankruptcy Court merely construed section 546(b) to protect this already existing right.

To construe section 546, as the Trustee suggests, as requiring the interest asserted to expressly relate back to a time period before the petition was filed turns the statute on its head. In essence if the Court adopted the Trustee's reasoning, section 546 would operate to destroy the very rights that the Banks are seeking to protect.[13] This Court will not construe section 546 in such a manner.

Moreover, case law following the *Parr Meadows* decision confirms this view. For example, in a more recent Second Circuit case addressing whether a pre-petition mechanic's lien placed against real property entitled the lien holder to post-petition proceeds against the lien, it was held that "nothing in § 546(b) indicate[s] that it applies only when the lienor fits within a 'relation back' statute. As long as an 'applicable law' authorizes perfection after another party has acquired an interest in the property, a lienor fits within the exception." *Klein v. Civale & Trovato, Inc. (In re Lionel Corp.),* 29 F.3d 88, 93 (2d Cir. 1994). This Court does not see why this reasoning fails to apply to a state created lien in post-petition proceeds flowing from chattel paper. Consequently, as long as the Banks provided the Trustee with the requisite section 546 notice of their intent to take possession of the lease proceeds, this Court will affirm the Bankruptcy Court.

### iii. *Notice under Section 546*

In order to ensure that the Banks do not lose their already perfected interest in post-petition lease payments, they are required to take possession of those payments within ten days after the Trustee receives them. *See* NYUCC § 9–306(3). This is relevant because, as described above, section 546(b)(2) allows an interest holder that is required under applicable law to seize property in order to accomplish, maintain, or continue perfection of an interest to notify the Trustee of their intent to seize within the time fixed by applicable law for seizure. *See* 11 U.S.C. § 546(b)(2). Once the interest holder notifies the Trustee of an intent to seize prop-

---

13. Moreover the Trustee's assertion that NYUCC § 9–306(3) does not relate back to a time frame prior to the petition also lacks merit. The interest in the lease proceeds arose at the exact instant the Banks took possession of the underlying chattel paper. It expired, if at all, ten days after the Trustee took possession of the proceeds. *See Bremen,* 131 F.3d at 1265 (stating that, "[i]f the accounts receivable in this case are identifiable proceeds of contract rights in which the Bank had a *continuously perfected* security interest, the accounts receivable (as proceeds) are deemed to be acquired for purposes of determining priority when the original contract rights were acquired") (emphasis added). Thus, even if section 546(b) did contain a "relation back" requirement, under NYUCC § 9–306(3)(c), the Banks interest in post-petition proceeds relates back to a date before the petition was filed.

erty in question the interest is automatically perfected. *See id.*

The Bankruptcy Court held that the Banks filing of their motion for relief from the automatic stay constituted sufficient notice for purposes of section 546(b) to effect seizure of all post-petition proceeds flowing from the underlying chattel paper. *See Marine Midland II,* slip op. at 45. The Trustee argues that this finding was in error because it allows the Banks to utilize section 546(b) as a "rotating exception" to the actual possession requirements of section 9–306(3) of the New York Uniform Commercial Code. To the extent that the Bankruptcy Court's finding does allow the Banks to avoid the actual possession requirements of section 9–306(3), this privilege is granted to the Banks under section 546(b)(2)'s express terms. *See Casbeer v. State Federal Savings & Loan Assoc. of Lubbock (In re Casbeer),* 793 F.2d 1436, 1442–43 (5th Cir.1986) (filing of motion for relief from automatic stay does constitute notice for section 546(b)(2)); *Virginia Beach Fed. Sav. & Loan Ass'n v. Wood (In re Wood),* 901 F.2d 849, 853 (10th Cir.1990) (filing of notice of claim for cash collateral also constitutes sufficient section 546(b) notice).

Moreover, the Bankruptcy Court's conclusion that the Banks only had to file this notice once and not continuously file notice with the Trustee every ten days served to ease the administrative burden of all involved in the current proceedings. Under these circumstances, this Court does not conclude that the Bankruptcy Court "rewrote state law," substantively expanded the Banks rights beyond that allowed under state law, or created new rights different from those that existed as of the date of bankruptcy. Accordingly, the Bankruptcy Court's finding the Banks have valid perfected security interests in identifiable post-petition lease payments received ten days prior to the date of the Banks' Motion for Relief and received by the debtor after the motion was served is affirmed.[14]

## 2. *Priority of Banks' Interest against Trustee's Interest Under § 544*

Under section 544(a) of the Bankruptcy Code, the Trustee is granted the rights of a judicial lien creditor under state law. Under New York law an unperfected security interest is subordinate to the rights of a person who becomes a lien creditor before the security interest is perfected. *See* NYUCC § 9–301(1)(b). The Trustee is endowed with the rights of a lien creditor on the date the petition is filed. *See* NYUCC § 9–301(3).

However as this Court has already discussed, the Banks hold a "continuously perfected security interest" in post-petition proceeds because of their possession of the underlying chattel paper. NYUCC § 9–306(3). As this continuously perfected security interest was created prior to the petition and existed the instant the proceeds were paid, the date of actual perfection relates back to the date the Banks took actual possession of the chattel paper. *See* UCC § 9–303 Official Comment 2 (explaining that if a "security interest is 'continuously perfected'" and there are no gaps between stages of perfection, the date of perfection is deemed to occur at the beginning of the unbroken chain leading to final perfection); *Chase Manhattan Bank (N.A.) v. State,* 48 A.D.2d 11, 12, 367 N.Y.S.2d 580 (3d Dep't 1975); *Heidelberg Eastern, Inc. v. Weber Lithography, Inc.,* 213 A.D.2d 127, 129, 631 N.Y.S.2d 370 (2d Dep't 1995); *Bremen,* 131 F.3d at 1265. As such, the Banks interest in post-petition proceeds was not unsecured on the date of the petition and the Bankruptcy Court's conclusion that Trustee does not

---

**14.** Because this Court has concluded that the Banks have a valid security interest in identifiable post-petition proceeds, it declines to address the issue of whether the Trustee waived his right to argue that the Banks were required to take post-petition action to preserve or continue valid liens in post-petition lease proceeds.

have priority over the Banks under § 544(a) is affirmed.

### 3. Equities of Case Exception

 The Trustee argues that even if the Banks have valid perfected security interests in post-petition proceeds flowing from the underlying chattel, the Bankruptcy Court should nevertheless have invalidated those interests pursuant to the equities of the case exception embodied in 11 U.S.C. § 552(b)(1). Under section 552(b)(1) an entity with a valid security interest in proceeds in property is entitled to have that interest enforced, "except to any extent that the court, after notice and a hearing and based on the equities of the case, orders otherwise." 11 U.S.C. § 552(b)(1). Under this standard, a Bankruptcy Court is required to "strike the proper balance between the rights of the secured creditor and the rehabilitative goals of the Code." *In re Island Helicopter Corp.*, 63 B.R. 515, 522 (Bankr. E.D.N.Y.1986); *United Virginia Bank v. Slab Fork Coal Co. (In re Slab Fork Coal Co.)*, 784 F.2d 1188, 1191 (4th Cir.1986).

To the extent that the Bankruptcy Court failed to address the Trustee's equities of the case arguments, it was in error. Nevertheless, upon a plenary review of the record, this Court finds that any such error was harmless. For example, the primary arguments the Trustee asserts regarding the Banks behavior focuses on the Banks' failure to exercise prudent lending practices when dealing with the debtor. At the same time, no evidence has been presented indicating that the Banks knew or should have known about improper procedures of the debtor requiring it to take additional action to protect the cash in which they claim an interest.

 Moreover, given that the primary purpose of the "equity exception is to prevent a secured creditor from reaping benefits from collateral that has appreciated in value as a result of the trustee's/debtor-in possession's use of other assets of the estate," *Great–West Life & Annuity Assur-* ance Co. v. Parke Imperial Canton, Ltd., 177 B.R. 843, 855 (N.D.Ohio 1994) quoting *Delbridge v. Production Credit Ass'n & Fed. Land Bank,* 104 B.R. 824, 826 (E.D.Mich.1989) (citations omitted), it appears that the Trustee's equities of the case arguments do not apply to the current situation. The Trustee's actions have done nothing to cause the underlying lease payments to appreciate in value while the Banks simply assert a right to their validly protected security interests recognized under "New York and Second Circuit law." *In re Bennett Funding Group,* 146 F.3d 136, 141 (2d Cir.1998). Accordingly, this Court holds that the equities of the case exception does not defeat the Banks' interest in post-petition lease proceeds.

### 4. Bankruptcy Court's Reconsideration of Marine I and Wilber I

In further support of its argument that the Banks do not have a perfected interest in post-petition proceeds flowing from the underlying chattel paper, the Trustee argues that the Bankruptcy Court was in error for reconsidering its earlier decisions of Marine Midland I and Wilber I. In those decisions, Judge Gerling initially ruled that the Banks did not have a perfected interest in post-petition proceeds flowing from the underlying chattel paper. He reconsidered that decision in Marine Midland II and Wilber II.

#### a. Standard for Reconsideration

 Motions for reconsideration proceed in the Northern District of New York under Local Rule 7.1(g), unless otherwise governed by Fed.R.Civ.P. 60. The "clearly erroneous" standard of review applies to motions for reconsideration. The moving party must "point to controlling decisions or data that the court overlooked—matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." *Shrader v. CSX Transp., Inc.,* 70 F.3d 255, 257 (2d Cir.1995).

Generally, the prevailing rule in the Northern District "recognizes only three possible grounds upon which motions for reconsideration may be granted; they are (1) an intervening change in controlling law, (2) the availability of new evidence not previously available, or (3) the need to correct a clear error of law or prevent manifest injustice." *In re C–TC 9th Ave. Partnership,* 182 B.R. 1, 3 (N.D.N.Y.1995). In the instant case, the Bankruptcy Court reconsidered Marine Midland I and Wilber I because of the need to correct a clear error of law. Although a Court enjoys broad discretion when making a determination to reconsider on this ground, *Von Ritter v. Heald,* 876 F.Supp. 18, 19 (N.D.N.Y.1995), it should not disregard the law of the prior case unless "the Court has a 'clear conviction of error' with respect to a point of law on which its previous decision was predicated." *Fogel v. Chestnutt,* 668 F.2d 100, 109 (2d Cir.1981). Because of this broad discretion, a court sitting in review of a lower court's reconsideration decision should only overturn it when the record provides evidence that the lower court abused that discretion. *See Cody, Inc. v. Town of Woodbury,* 179 F.3d, 52, 56 (2d Cir.1999).

b. *Abuse of Discretion*

This Court does not conclude that the Bankruptcy Court abused its discretion when it reconsidered *Marine Midland I* and *Wilber I.* Much like the Banks' argument that the *UCC* decision was binding on the Bankruptcy Court, the Trustee asserts that the Bankruptcy Court improperly granted the motions for reconsideration despite the fact that the Banks could have

raised the section 546 issues before trial and failed to do so. This is incorrect.

The section 546 argument was raised prior to trial but the Bankruptcy Court declined to address it because the majority of banks asserted that they had filed proper financing statements. *See Bennett Funding,* 203 B.R. at 39, 42. Because the Court declined to address a properly raised issue before trial does not automatically mean that the parties raising the issue waived it as well. Moreover, this did not preclude the Bankruptcy Court from revisiting the overlooked issue following the trial when the circumstances warranted such. Not only was the issue deliberately avoided at trial because of the Bankruptcy Court's mistaken belief that the outcome at trial would render the issue moot, it changed its outcome. Under these circumstances this Court concludes that the Bankruptcy Court properly exercised its discretion when it chose to reconsider *Marine Midland I* and *Wilber I.*

D. **Identification of Chattel Paper, Substitute Leases, and Lease Payments**

The Trustee and Banks both assert various arguments that address whether various assets of the estate are identifiable. As these issues require the Court to address mixed questions of fact and law, the de-novo standard is used to address legal findings and the clearly erroneous standard is used to address factual findings.

1. *Chattel Paper*

As a threshold matter, this Court must determine whether the Bankruptcy Court's finding that certain of the leases were not chattel paper is valid.[15] As the

---

**15.** In part, the leases in question are: (i) for the Ohio Bank—Nos. 9201125 (8–21–92 transaction); 92051316 (12–4–92 transaction); 94022703, 940312171, 94031272 (4–25–94 transaction); 94030924 (10–26–94 transaction); 94022795 (7–15–94 transaction); 94051784 (7–13–94 transaction); 94093324 (10–26–94 transaction); (ii) for Mid Am Bank—Nos. 9421724A, 94121724B, 9421725A, 9421725B (3–28–94 transaction);

94021337, 94021481, 94022744 (4–29–94 transaction); 94032237 (6–7–94 transaction); 9404061, 94050334 (7–15–94 transaction); 94032887, 94051737 (7–19–94 transaction); 94090706, 94090844 (10–17–94 transaction); 95040801, 95041140 (5–15–95 transaction); (iii) for Wabasha—No. 94072099(iv) for Williston—No. 94121917; (v) for Carmi—Nos. 91071204, 91080606, 91100464, 91060201A, 91060201B (12–4–91 Bank of Carmi, individ-

Banks primarily argue that the Bankruptcy Court applied the wrong legal test to determine whether the leases in question were chattel paper, this Court reviews this issue de-novo.

■ Chattel paper is defined as a "writing or writings which evidence both a monetary obligation and a security interest in or a lease of specific goods." NYUCC § 9–105(b); *see National Westminster Bancorp v. ICS Cybernetics, Inc. (In re ICS Cybernetics, Inc.)*, 123 B.R. 467, 475–76 (Bankr.N.D.N.Y.1989). The specificity requirement is met if the contents of the documents creating the chattel paper "reasonably identif[y] what is described." NYUCC § 9–110. As the Bankruptcy Court correctly noted, this standard does not require the underlying documents to use serial numbers or the most "exact and detailed descriptions" to identify the office supplies underlying the leases. *Carmi*, slip op. at 13; *see also Goudeau v. Arzt (In re Sarex Corp.)*, 509 F.2d 689, 691 (2d Cir.1975). Rather, the standard is built upon the predicate that an individual be able to identify the particular goods listed in a lease. *See Commercial Trading Co. v.*

*Bassin (In re Laminated Veneers Co.)*, 471 F.2d 1124, 1124 (2d Cir.1973).

■ Given this standard, any description in collateral "must enable a third party to distinguish between collateral and other, similar goods that the debtor own[s]." *In re Keene Corp.*, 188 B.R. 881, 893 (Bankr.S.D.N.Y.1995). In the context of office supplies, the Bankruptcy Court noted that "a single lessee could have several contracts/leases for several pieces of equipment of the same manufacturer and model number and the only feature distinguishing the different pieces of equipment is their serial numbers." *Marine Midland I*, slip op. at 26. This Court's review of the questioned leases leads it to the same conclusion.

■ Moreover the Banks have provided this Court with no way to avoid this dilemma without questioning whether the contested leases provide serial numbers of the office equipment listed.[16] This Court's affirmation of the Bankruptcy Court on this matter in no way condones use of the serial number test to mechanically conclude that a particular lease does not adequately identify the goods in question. Instead, this Court's affirmation of the

ually transaction); 93010649 (2–25–93 Bank of Carmi, individually, transaction); 91040243, 91040301, 91050106 (6–3–91 Ron Absher transaction); 920050175 (7–24–92 Ron Absher transaction); 94062041 (8–10–94 Ron Absher transaction); 91041153, 91050310 (6–6–91 Jane Absher transaction); 92030760 (6–5–92 Jane Absher transaction); 92041046, 92041318 (7–24–92 Jane Absher transaction); 91020240, 91020417 (3–28–91 Henry Absher transaction); 91040864 (6–3–91 Henry Absher transaction); 93011545 (3–3–93 Henry Absher transaction); 94061896 (8–10–94 Henry Absher transaction); 91081120 (12–18–91 $244,481.94 Oil Co. transaction); 92041956 (7–24–92 Henry Absher d/b/a Absher Oil Co. transaction); 94053289, 94061361 (8–10–94 Henry Absher d/b/a Absher Oil Co. transaction).

16. In a comparatively extreme example, Lease No. 95040801 lists "1 DK 8" and "4 2010 SD" as the items covered in the lease. These descriptions are incomprehensible and provide no way for any individual to ascertain

the identity of the goods covered under the lease. In another comparatively extreme example, Lease No. 94050334 lists "5 Recreational Vehicles" as the items covered in the lease. Not only is this description vague, generic, and unreasonable it fails to identify whether the type of vehicle covered is a car, jeep, ATV, ATC, boat, or plane. A more representative sample is Lease No 94021481. That lease lists "1 each MG–M92 Surgery Microscope complete w/ floor mntd stand, MC–A50 Beam Splitter w/ 2 parts, MCA119 Video TV Camera Adapter. SI–JE3462HR Color TV Camera w/cables & power supple" as the equipment underlying the Banks' security interest. Although it provides the brand, model, and location of the various pieces of medical equipment underlying the Banks' security interest in that lease, it does not allow this Court to distinguish between the pieces of equipment listed and other pieces equipment possibly existing at the same location that are the same brand and model as those listed. Therefore, this Court affirms the Bankruptcy Court's holding that it is not chattel paper.

Bankruptcy Court's decision only implies that in a situation where there is no other way to identify a piece of collateral, a court may, as part of its use of a multitude of factors, look at the leases to see if they provide the serial numbers of the underlying equipment.[17]

In making this decision, this Court is especially cognizant of the fact that two of the nine leases found by the Bankruptcy Court to sufficiently identify leased equipment and constitute chattel paper did not contain serial numbers. *See First State Bank of Wabasha v. The Bennett Funding Group, Inc. (In re The Bennett Funding Group)*, No. 96–61376, Adv. Proc. 96–70095A, slip op. at 15 (Bankr.N.D.N.Y. Dec. 18, 1997) (holding that Leases Nos. 9406233 and 95030126 constituted chattel paper) (hereinafter "Wabasha"). Accordingly, this Court concludes that the Bankruptcy Court did not rely strictly on the serial number test to determine whether certain leases were chattel paper or accounts and affirms its findings that the challenged leases lacking do not sufficiently identify the underlying collateral so as to constitute chattel paper.[18]

### 2. Lease Payments

■ The Banks argue that the Bankruptcy Court was in error because it concluded as a matter of fact that lease payments the Trustee received before the Segregation Orders were issued were not identifiable. According to the Banks, the Trustee had a statutory duty to segregate all lease payments from the moment the petition was filed. *See* 11 U.S.C. § 363(c)(4). The Banks argue that the

Trustee's ability to comply with the Bankruptcy Court's Segregation Order enforcing this duty proves that all lease payments paid post-petition were identifiable as of the petition date.

Relying on evidence adduced at trial, the Bankruptcy Court concluded that lease payments received prior to the Segregation Orders were not identifiable because the Trustee had deposited the funds into a "honeypot." Recognizing that commingling secured and unsecured funds does not make the secured funds impossible to identify as long as they can be traced, the Bankruptcy Court examined the factual evidence brought to its attention and concluded the commingled funds could not be traced. In particular, the Court noted that, because the Trustee was not approved until April 18, 1996, there was no evidence to indicate the date upon which he actually began to segregate lease payments. *See Carmi*, slip op. at 76. In light of these conflicting factual circumstances this Court concludes that the Bankruptcy Court's was not clearly in error when it concluded that lease proceeds deposited with the Trustee prior to the issuance of the Segregation Orders were not identifiable.

### 3. Substitute Leases

In a related argument, the Trustee argues that substituted leases[19] are neither (a) attached nor (b) perfected. The Trustee asserts that because the substituted leases are not listed in the security agreement or financing statements, they are not sufficiently identified to allow an interest to attach. In particular, the Trustee

17. This Court also notes, that as additional leases are brought before the Bankruptcy Court, the lawyers for the Banks should endeavor to provide non-serialized evidence, if available, that distinguishes a particular piece of office equipment listed on the lease from other similarly situated pieces of equipment. If the evidence presented allows the Bankruptcy Court to reasonably identify a particular piece of office equipment, the challenged lease is chattel paper regardless of whether it includes the equipment's serial number.

18. For this reason, although the Court is cognizant of the Banks' suggestion that the Court appointed special master review the challenged leases, this is unnecessary at this time.

19. Substituted leases are leases not listed in any transaction documents or any UCC–1s. They are leases substituted for those originally pledged.

points out that the pool of leases that are the subject of this dispute contains approximately 50,000 active leases. As such, any grant of interest in a "substitute lease" must sufficiently distinguish any lease that constitutes a substitute or replacement lease from the remaining 50,000 in the pool.

It is not disputed that the substitute leases in question constitute "after-acquired property" of the debtor under New York's Commercial Code. *See* NYUCC § 9–204(1). A lien in after-acquired property is, in large part, a "floating lien" on property acquired by the debtor following execution of an initial security agreement. *See* UCC § 9–305 Official Comment 2. Although such liens were initially prohibited under the Uniform Commercial Code, the drafters reluctantly recognized the validity of security interests created in general classes of after acquired property. *See id.*

■ Of course, the Code's repeal of the prohibition against "floating liens" did not dispense entirely with the need to identify particular of classes after-acquired property in order for the floating lien to be valid. Instead, courts recognized that the specificity required to attain an interest in after acquired property was less than the specificity required to attain an interest in the original property. *See United States v. Smith,* 832 F.2d 774, 777 (2d Cir.1987). Consequently, as long as an after-acquired property interest fits within one of the general categories of collateral described in the security agreement and financing agreement, it is sufficiently identifiable. *See id.*

■ In this case, the term substitute leases falls within the general property class of leases. Accordingly, the Bankruptcy Court was not in error to conclude that such leases were sufficiently identifiable and that a security interest in them attached and became perfected when the Banks' obtained possession of the original chattel paper.

**E. Decision to Lift the Automatic Stay**

■ The Trustee and Banks both assert that the Bankruptcy Court was in error for concluding to lift the automatic stay against some assets and refusing to lift it against other assets. As the decision to lift the automatic stay is vested within the "sound discretion" of the Bankruptcy Court, this Court will review the lower court's rulings for any abuse of this discretion. *In re Sonnax Indus., Inc.,* 907 F.2d 1280, 1286 (2d Cir.1990).

1. *Bankruptcy Court's Finding that Cause Existed to Lift the Automatic Stay*

■ Section 362(d) of the Bankruptcy Code provides two independent and mutually exclusive grounds upon which a Bankruptcy Court is authorized to grant relief from the automatic stay. *See* 11 U.S.C. § 362(d). The first ground allows the Bankruptcy Court to lift the automatic stay for "cause." 11 U.S.C. § 362(d)(1). The second ground allows the Bankruptcy Court to lift the automatic stay if the Debtor does not have equity in property the creditor is seeking and the property is not necessary for reorganization. *See* 11 U.S.C. § 362(d)(2).

The Trustee argues that the Bankruptcy Court abused its discretion in concluding to lift the automatic stay because it utilized the second prong of section 362(d)(2) to conclude that cause existed to lift the automatic stay under section 362(d)(1). This Court disagrees. The Bankruptcy Court held that because the debtors did not have any intent to reorganize utilizing the lease payments and the Banks were in danger of having their secured claims increase to the detriment of the investor creditor body, cause existed to lift the automatic stay under 11 U.S.C. § 362(d)(1).

The Bankruptcy Court's finding that the debtors did not have any intent to reorganize utilizing the lease payments implies that the lease payments were not necessary for reorganization under 11 U.S.C. § 362(d)(2). Had the Bankruptcy Court

relied strictly on this finding to conclude that cause existed under section 362(d)(1) to lift the stay, it is likely that this Court would have found that finding to constitute an abuse of discretion. *See In re Drexel Burnham Lambert Group, Inc.*, 113 B.R. 830, 838 (Bankr.S.D.N.Y.1990) (stating that there is "no support for the Banks' assertion that lack of need or harm and judicial economy constitutes cause under section 362(d)(1)").

The Bankruptcy Court did not however rely strictly on this finding. Instead it found, in addition to lack of necessity, that further delay in requiring the Trustee to turn over the lease payments could operate to the detriment of the entire investor creditor body. *See Carmi*, slip op. at 88. This finding, in conjunction with the lack of necessity, may in fact constitute cause for the Bankruptcy Court to lift the automatic stay. *See In re Abrantes Constr. Corp.*, 132 B.R. 234, 237 (N.D.N.Y.1991) (listing twelve factors that a court should weigh when deciding whether cause exists to lift an automatic stay including the impact of the stay on the various parties and balance of the harms). Consequently, this Court concludes that the Bankruptcy Court did not abuse its discretion when it decided to lift the automatic stay against the Banks. *See Royal Ins. Co. v. McCrory Corp.*, 176 B.R. 318, 320 (S.D.N.Y.1995); *Johns–Manville Corp. v. Asbestos Litig. Group (In re Johns–Manville Corp.)*, 40 B.R. 219, 225 (S.D.N.Y.1984).

### 2. *Bankruptcy Court's Failure to lift the Automatic Stay Against Other Assets*

When the Bankruptcy Court issued its decision to lift the automatic stay in favor of the Banks, it limited its decision to a specific subset of collateral, "Schedule A" lease payments, without addressing the Banks argument that they are entitled to have the stay lifted as to all the lease payments and the underlying equipment. *See Carmi*, slip op. at 8, n. 4. Because the parties disputed numerous factual issues regarding the Banks' entitlement to have the automatic stay lifted against all lease payments and equipment, the Bankruptcy Court treated the Banks' motions for relief as applying only to outstanding Schedule A payments. *See id.*

It therefore declined to render a decision with respect to the Banks' remaining lease payment and equipment claims. *See id.* The Banks assert that they are entitled to have the automatic stay lifted against non-Schedule A payments and the equipment because either (1) the automatic stay has terminated as to these items or (2) the express terms of the security agreement outlining their entitlements gave them these rights. As the first issue is a matter of law, the Court reviews it de novo.

According to section 362(e) of the Bankruptcy Code, a party filing a request for relief from the automatic stay is entitled to have a hearing on their motion within 30 days of filing or the stay automatically terminates. *See* 11 U.S.C. § 362(e). If the Bankruptcy Court conducts a final hearing on the matter within this 30 day window, the statute is satisfied and the Bankruptcy Court may either decide the matter at the hearing or continue the stay pending the Court's ultimate decision. *See id.*

If the Bankruptcy Court is unable to conduct a final hearing within the 30 day time frame, it must, at a minimum, conduct a preliminary hearing that satisfies the notice and hearing requirements of section 102(1)(a). *See id.* After conducting a preliminary hearing, the 30 day clock begins running again. *See id.* If the Bankruptcy Court is unable to hold a final hearing on the creditor's claims within this new 30 day window, it must either obtain the consent of the parties to extend the time frame or issue an order finding compelling circumstances that warrants an extension of the stay for a specified time. *See id.*

The Banks argue that the Bankruptcy Court's failure to address its claims

against non-Schedule A payments and equipment, more than four years after they were filed and two years after the initial opinion was issued violates the express mandates of section 362(e). As such, they claim that the automatic stay against these items terminated. *See Grundy Nat'l Bank v. Looney (In re Looney),* 823 F.2d 788, 792 (4th Cir.1987); *Prudential Ins. Co. of Am. v. Ryan Place Joint Venture,* 93 B.R. 471, 474 (N.D.Tex.1988). This Court disagrees.

Within thirty days of the Banks' initial filing of their motion for relief from the automatic stay, the Bankruptcy Court conducted a status conference "to address various factual and legal matters common to most, if not all, of the [various] [b]ank's motions." *Carmi,* slip op. at 5. This status conference fulfilled the initial "notice and hearing" requirement of section 362(e), as it gave notice to the petitioning creditors that the Bankruptcy Court intended to act upon its claim. *See* 11 U.S.C. § 102(1)(a) (defining notice and hearing as "such notice as is appropriate in the particular circumstances, and such opportunity for a hearing as is appropriate in particular circumstances"); *John Hancock Mutual Life Ins. Co. v. Forseen Inc. (In re Forseen Inc.),* 81 B.R. 903, 905 (N.D.Ill.1987); *United States v. Marine Power & Equipment Co. Inc. (In re Marine Power & Equipment Co. Inc.),* 71 B.R. 925, 928 (W.D.Wash.1987). Moreover, it also gave the Bankruptcy Court time to review the evidence before continuing the stay. *See John Hancock Mutual Life Ins. Co.,* 81 B.R. at 905.

Following this initial hearing, the Bankruptcy Court renewed an Omnibus Order it issued earlier against the Banks. In this Order, the Bankruptcy Court stated that because "approximately 240 banks ...

filed motions for relief from the automatic stay and/or claimed interests in various equipment leases" and "based on their numerosity and the burden said motions place on the Debtors and/or Trustee at this stage of the case" compelling circumstances exist for extending the time for final hearings. *Carmi,* slip op. at 4, n. 2. The Banks did not object to this extension and further extensions of time as the Bankruptcy Court conducted consolidated hearings on their claims over the following two years.[20]

The Bankruptcy Court's issuance and renewal of the Omnibus Order brought it within the specific statutory language of section 362(e). Additionally, given the unyielding burden this case placed on the Court's docket, this Court believes that the Bankruptcy Court did not abuse its discretion in finding that compelling circumstances existed to renew the Omnibus Order for specified amounts of time over the past few years. This is especially true given the fact that the Banks did not object to these renewals until they appealed the Bankruptcy Court's rulings on the Schedule A payments.

On the record before this Court, it is unclear whether the Bankruptcy Court conducted final hearings on the Banks non-Schedule A and equipment claims.[21] *See Marine Midland I,* slip op. at 39, n. 21 (stating that these issues "can be further addressed in the pending adversary proceeding commenced by Marine"). If the Bankruptcy Court did not conduct a final hearing on these issues, continued renewal of the Omnibus Order without objection from the parties, was sufficient to postpone such hearings given the compelling circumstances of this case. Furthermore, this Court notes that the Banks' inclusion

---

**20.** The Banks also concede that they consented to this extension at least until the Bankruptcy Court issued the decisions that are the subject of this appeal.

**21.** If, however, the Bankruptcy Court did conduct final hearings on this issue, this Court notes that section 362(e) provides no substantive time limitation upon which a Court must actually issue a decision. As such, if the Bankruptcy Court did hold final hearings on the non-Schedule A and equipment claims but has not yet issued a decision on these claims, it is also in compliance with section 362(e).

of the non-Schedule A and equipment claims along with the Schedule A claims stripped the Bankruptcy Court of its jurisdiction to further address these claims so the Bankruptcy Court remained in compliance with the statute during the pendency of this appeal.

Accordingly, this Court holds that because the Banks entitlement to non-Schedule A and Equipment claims involve mixed questions of fact and law that have not yet been decided by the Bankruptcy Court, it will not address them in the first instance now. *See In re Ionosphere Clubs, Inc.,* 114 B.R. 379, 388 (S.D.N.Y.1990). It therefore remands these issues to the Bankruptcy Court and, assuming a final hearing has not occurred, orders it to conduct a final hearing within 30 days of the issuance of this opinion unless compelling circumstances or consent of the parties dictate otherwise.

**F. Trustee's Entitlement to Recoup Administrative Costs and Banks' Entitlement to Interest**

1. *Trustee's Entitlement to Recoup the Administrative Costs Pursuant to § 506(c)*

 Section 506(c) of the Bankruptcy Code provides that a "trustee may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving ... such property to the extent of any benefit to the holder of such claim." 11 U.S.C. § 506(c). The Second Circuit has held that "[i]f expenses for the preservation or disposition of property are incurred primarily for the benefit of a creditor holding a security interest in the property, such expenses, properly identified, may be charged against the secured creditor." *In re Flagstaff Foodservice Corp.,* 739 F.2d 73, 76 (2d Cir.1984).

As discussed above, this Court reviews findings of fact made by the Bankruptcy Court under the clearly erroneous standard. "The Bankruptcy Court's findings

need only be a plausible interpretations of the record, and if so, this Court will not reverse even if it considers there to be a better interpretation." *In re Grant Assoc.,* 154 B.R. 836, 842 (S.D.N.Y.1993) (citing *Anderson v. City of Bessemer City, N.C.,* 470 U.S. 564, 573, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985)).

In its *Carmi* decision, the Bankruptcy Court determined that, "under the unique circumstances of this case, the expenditures of the Trustee in servicing the Leases and collecting the Lease Payments have been necessary to preserve the value of the Leases/Lease Payments and that such expenditures have benefitted the Bank." *Carmi,* slip op. at 94. The Court based its decision on the fact that the Trustee's continued servicing of the leases and collection of the lease payments "prevented disruption and chaos which would have occurred if all the banks had attempted to redirect the lease payments and begin the collection process on their own." *Id.* Under these circumstances, this Court concludes that the Bankruptcy Court's determination that the Trustee's services resulted in direct and primary benefit to the secured creditors was not clearly erroneous.

2. *Banks' Entitlement to Interest*

 In addition to their claim for administrative costs, the Banks also assert that they are entitled to interest earned on lease payments while the Trustee held these payments in the Bankruptcy Court ordered segregated accounts. The Bankruptcy Court declined to award the Banks interest without prejudice.

At this point, this Court does not believe that the Bankruptcy Court abused its discretion when it declined to award interest to the Banks. Under 11 U.S.C. § 506(b), only an oversecured creditor is entitled to post-petition interest on any recovery of a secured claim. *See* 11 U.S.C. § 506(b). The Bankruptcy Court reserved a final determination regarding the full value of the Banks' claim.

Nevertheless, the Banks rely on two first Circuit cases, *In re Shop–N–Go of Maine, Inc.*, 61 B.R. 292 (D.Me.1986) and *Boston and Maine Corp. v. Moore*, 776 F.2d 2 (1st Cir.1985), for the proposition that they are entitled to post-petition interest. In both of these cases, the Court analogized the proceeds that the trustee had segregated to interpleaded funds and not interest on the underlying claim. This is not the situation here.

In this case, the lease proceeds placed into the segregated funds are an integral part of the entire value of the Banks claim. As such, the filing of the bankruptcy petition prevents the Banks from recovering interest on any successful claims until they make the required showing that they are oversecured. *See Accord Key Bank Nat'l Ass'n v. Milham (In re Milham)*, 141 F.3d 420, 423 (2d Cir.1998). The rationale behind this rule is well settled.

When a party is oversecured, the value of the collateral, when transferred to the creditor, is adequate to pay the underlying claim along with post-petition interest without harming the interests of the rest of the estate. *See In re Johnston*, 44 B.R. 667, 669 (Bankr.W.D.Mo.1984) To allow a the Banks to receive these funds without providing evidence that they are oversecured creates a risk that the other portions of the estate may be harmed. In light of this risk, this Court declines to order the Bankruptcy Court to pay interest to the Banks and agrees with its finding that the Banks are entitled to post-petition interest upon a showing that they are oversecured creditors.

## G. Trustee's Entitlement to Withhold Amounts Alleged to be Voidable Preferences and Fraudulent Conveyances

### 1. Voidable Preferences

In each of the decisions below, the Bankruptcy Court modified the automatic stay to permit the Banks to receive all Schedule A payments except those alleged to be voidable preferences. The Banks assert that the Bankruptcy Court abused its discretion when it refused to allow them to receive payments alleged to be voidable preferences. This claim is devoid of merit.

The Bankruptcy Court simply permitted the Trustee to withhold the challenged amounts pending a final determination of the merits of the voidable preference claim. The funds are in the Trustee's account and not available for distribution to general creditors. If the Bankruptcy Court ultimately concludes that the funds in question were not transferred in violation of the statutory prohibition against voidable preferences, they will be made available to the Banks. Consequently, the Bankruptcy Court's decision to withhold these funds was not a decision to create a set-off but was a valid exercise of its discretionary powers. *See Grella v. Salem Five Cent Sav. Bank*, 42 F.3d 26, 33–34 (1st Cir.1994); *Cheshire County Sav. Bank v. Pappas (In re Pappas)*, 55 B.R. 658, 661 (Bankr.D.Mass.1985). As such, the Bankruptcy Court's decision on this matter is affirmed.

### 2. Fraudulent Conveyances

The Trustee asserts that it is entitled to withhold amounts alleged to be fraudulent conveyances. Initially, the Bankruptcy Court ruled that the Trustee was not entitled to withhold these payments because there was a question whether the Trustee "state[d] a claim upon which relief can be granted." *Carmi*, slip op. at 88–89 n. 35. Subsequent to this decisions, the Bankruptcy concluded that the fraudulent conveyance claims stated a prima facie case upon which relief could be granted. *See Breeden v. Gloucester Bank & Trust Co. (In re The Bennett Funding Group, Inc.)*, No. 96–61376, Adv. Proc. 98–70037A, slip op. at 35–36 (Bankr.N.D.N.Y. Feb. 9, 1999); *See Breeden v. Gloucester Bank & Trust Co. (In re The Bennett Funding Group, Inc.)*, No. 96–61376, Adv. Proc. 98–70037A, 98–70036A, 98–70039A, 98–70021A, 98–70023A, 98–70027A, 97–

70038A, slip op. at 6 (Bankr.N.D.N.Y. April 27, 1999).

 Because the Bankruptcy Court has not yet determined whether the Trustee is entitled to withhold amounts alleged to be fraudulent conveyances that survived the Banks' motion to dismiss, the Banks argue that this Court should not address this issue now. As a general matter of policy appellate Courts do not consider any issue that was not raised in lower proceedings. *See In re Ionosphere Clubs, Inc.*, 114 B.R. 379, 388 (S.D.N.Y.1990). However, "[w]here the proper resolution of a dispute is beyond any doubt ... an appellate court may, in its discretion, consider issues that were not addressed in the first instance by a lower court." *Id.* at 388. In the interests of judicial economy, this Court chooses to exercise its discretion to decide this legal matter even though it was not initially addressed below.

 If the Trustee succeeds on his claims of fraudulent conveyance that have not yet been dismissed, the Banks will not be entitled to maintain a right to these disputed payments. *See Cheshire County Sav. Bank v. Pappas (In re Pappas)*, 55 B.R. at 661. This means that there is a question as to whether the Banks are entitled to these payments. Accordingly, this Court concludes that the Trustee is entitled to withhold any payments alleged to constitute a fraudulent conveyance that have withstood a motion to dismiss in the Bankruptcy Court.[22]

## H. Banks Entitlement to Adequate Protection of the Security Interests in the Leases

 The Banks assert that they have not received adequate protection of their interests pursuant to 11 U.S.C.

§ 363(e). In relevant part, that section of the Bankruptcy Code states that "at any time, on request of an entity that has an interest in property used, sold, or leased, ... by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest." 11 U.S.C. § 363(e). This concept indicates that a "secured creditor has a constitutional right to have the value of its secured claim on the petition date preserved." *In re Keystone Camera Prods. Corp.*, 126 B.R. 177, 183–84 (Bankr.D.N.J. 1991). To maintain this right to adequate protection, a secured party, under certain circumstances, is entitled to cash payments or additional security if the value of the security interest depreciates during the automatic stay. *See United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 370, 108 S.Ct. 626, 98 L.Ed.2d 740 (1988).

 As already discussed, the Trustee is holding all lease proceeds in segregated accounts made unavailable to other creditors. If and when the Bankruptcy Court determines that the Banks are entitled to these funds, they will be turned over to the Banks along with any other determined amounts. Moreover, the Banks concede that the value of their interest in the underlying leases is directly proportional to their right to payment. Since this Court has affirmed the Bankruptcy Court's holding that the Banks do have a valid perfected security interest in Schedule A lease payments and that the automatic stay should be modified to permit the Banks to receive these payments, by their own admission, the Banks cannot claim that they have not received adequate protection. Consequently, this Court affirms the Bankruptcy Court's finding that the Banks

---

**22.** The Trustee is required to place any withheld funds pursuant to this holding in a segregated account. He is to hold these funds in escrow and is prohibited from distributing them to any creditor until such time as the Bankruptcy Court determines their ultimate disposition. Any withheld payments will re-

tain their character as lease payments and the Trustee is required to maintain sufficient records to trace the proceeds of the lease to allow payment of the full lease proceeds should the Bankruptcy Court ultimately determine that the Banks are entitled to the withheld payments.

have received adequate protection of their security interests.

## I. Bankruptcy Court Error in Failing to Direct Turnover of Lease Payments to Wabasha from the Petition Date

 Wabasha Bank ("Wabasha") argues that the Bankruptcy Court erroneously declined to award it payments collected under one of three portfolios (the "1995 Transaction") from the date of the petition. According to Wabasha, the Bankruptcy Court found that the leases contained in the 1995 Transaction were perfected by a valid UCC–1 financing statement and sufficiently identifiable for the Bank to receive payments as of the petition date. The Bankruptcy Court, without explanation, allowed the Bank to receive payments on these lease as of the date of the segregation order. *See Wabasha*, slip op. at 56.

Implicit in this holding is the likelihood that the Bankruptcy Court believed that these lease payments were not identifiable prior to that date. However, without an explanation as to whether this assumption is correct, this Court is not in a position to order the Trustee to pay Wabasha payments received as of the petition date. Consequently, this Court remands this issue back to the Bankruptcy Court with specific instructions that, if it finds that leases in the 1995 Transaction were sufficiently identifiable on the petition date, payments on those leases from that date should be directed to Wabasha.[23]

### IV. Conclusion

Accordingly, it is hereby

ORDERED that the Bankruptcy Court is REVERSED in part and AFFIRMED in part; and it is further

ORDERED that this case is REMANDED to the Bankruptcy Court for further proceedings consistent with this opinion; and it is further

ORDERED that the Clerk shall serve a copy of this Order by United States Mail upon the attorneys for the parties appearing in this action.

IT IS SO ORDERED.

---

23. OCUS argues on appeal that the Bankruptcy Court erroneously granted amicus curiae status to Mid Am and Ohio Banks in the Marine Midland II Decision. *See Marine Midland II*, slip op. at 32. In light of the fact that these matters have been consolidation for appeal because of their shared factual and legal issues, OCUS cannot establish that the Bankruptcy Court's decision, even if erroneous, caused any harm. Indeed, OCUS does not appear to be seeking any particular relief and is only arguing that the Bankruptcy Court made a mistake.