**In re Robert Jack MARAS, SSN
440–50–8502, Debtor.**

**Bankruptcy No. 98–00860–R.**

United States Bankruptcy Court,
N.D. Oklahoma.

Oct. 27, 1998.

J. Edwin Poston, Jenks, OK, for Debtor.

Sidney K. Swinson, Tulsa, OK, for Jana K. Smith.

Lonnie D. Eck, Tulsa, OK, Chapter 13 Trustee.

### ORDER

TOM R. CORNISH, Bankruptcy Judge.

This matter came on for evidentiary hearing on the 1st day of October, 1998. This matter was assigned to the undersigned Judge on October 1, 1998. The Debtor, Robert Jack Maras, appeared in person with his counsel, J. Edwin Poston. The former wife of the Debtor, Jana K. Smith, appeared in person and with her attorney, Sidney K. Swinson. Lonnie D. Eck, Chapter 13 Trustee, also appeared and presented a statement to the Court.

After hearing the evidence presented, the Court hereby enters the following findings and conclusions in conformity with Rule 7052, Fed.R.Bankr.P., in this core proceeding.

### BACKGROUND

At the outset, the Court would observe that this divorce has been one of the most contentious and bitter proceedings in this Court's experience in thirty years as a practicing attorney and a member of the judiciary. Ms. Smith, the former wife, has had the services of Mr. Richard Wagner and his law firm from the commencement of the divorce until the post-divorce proceedings were stayed as a result of the filing of bankruptcy by Mr. Maras. Mr. Maras has been through some five attorneys during the divorce and post-divorce proceedings, most of whom have been paid little or nothing at all. Reviewing the chronology of the divorce proceeding from April, 1991 to March, 1998, the Court believes there is little likelihood that any of the proceedings in the state court will ever cease. After hearing some six hours of testimony in this matter, the Court did find one positive thing that is happening in this family in spite of all the bitter litigation. That is, the parties have a delightful, intelligent and outstanding athletic son, Adam Maras. He is presently a junior in a private high school and has been an outstanding student, scholar and athlete. Adam has lived with his father since May, 1996, after his father purchased a new home. Adam was in his mother's custody during the divorce and for most of the time until an "agreed" trial custody order was entered by the divorce court on August 30, 1996, which gave Mr. Maras custody from May 31, 1996 until at least June 1, 1997. The temporary custody agreement was to end on June 1, 1997, but by agreement, Adam has remained with his father to this date.

It appears to this Court that over 90 percent of the divorce litigation has been the result of Mr. Maras either not paying or being delinquent in paying certain obligations due under the divorce decree which required him to pay: (1) child support, (2) support alimony and (3) property division judgment. Since Mr. Maras has had physical custody of Adam, the parties agreed that Ms. Smith would not pay child support. However, there is a Motion pending in the divorce court, presently stayed, to require Ms. Smith to make periodic child support payments for Adam. Adam is now 16 years of age.

### FINDINGS OF FACT

1. Ms. Smith is the Catering and Reservation Manager of the Summit Club in Tulsa. She and Mr. Maras were married in 1975 and divorced in 1992. Their son, Adam, is 16 years of age and was born on December 23, 1981. Ms. Smith was awarded custody of Adam, after a bitterly contested divorce trial on almost every issue that could possibly be tried in a divorce case. Ms. Smith makes approximately $2,500 per month. Ms. Smith appears to be in good health and lives in her own home. The Court finds that Ms. Smith is not destitute.

2. At the time of the divorce, Mr. Maras was a retired Detective receiving monthly

retirement benefits from the Tulsa Police Department. In the divorce decree, the divorce judge found that Ms. Smith should be awarded from the jointly acquired marital property the following: (a) household furnishings valued at $4,250; (b) certificate of deposit valued at $45,100; and (c) 50 percent of Mr. Maras' police retirement, of which 67 percent was marital property. In recognition of her interest in the joint marital property, Ms. Smith was given a judgment against Mr. Maras in the amount of $65,-802.50. Pursuant to a Supplemental Order on rehearing, the payments by Mr. Maras of the property division were to be paid at $360 a month from April 5, 1992 until April 5, 1996; at the rate of $570 per month from May 5, 1996 until December 5, 1999; and at the rate of $700 per month from January 5, 2000 until the amount was paid in full.

3. At the time of the divorce, using the mandatory child support computation guidelines, the Honorable Russell Hass, divorce judge, directed that Mr. Maras pay $291 per month child support while Adam was in his mother's custody. Adam's health insurance is being provided by the Summit Club's carrier, at no expense to Ms. Smith.

4. The divorce decree ordered Mr. Maras to pay support alimony to Ms. Smith in the total amount of $7,560 starting April 5, 1992 and payable for 48 consecutive months as follows: (a) $105 per month for 12 months; (b) $210 per month for 24 months; and (c) $105 per month for the last 12 months. The issue of payment of attorney fees in the divorce trial was reserved by the court upon application by either party within 20 days. This Court did not hear any evidence of whether either party was awarded fees and costs for the divorce trial on the merits.

5. Mr. Maras was represented by Mr. Michael J. Carson in the trial of the divorce.

6. The Court finds that of the periodic and sporadic payments made by Mr. Maras to Ms. Smith, he paid support alimony to her past the period he was obligated to pay that alimony. Since he was still obligated to make payments under the property division award, Ms. Smith continued to accept the support alimony payments and credit them against other payments due her by him.

7. The Court heard extensive testimony from Mr. Richard Wagner, Ms. Smith's attorney from the filing of the divorce and throughout all post-divorce proceedings. Mr. Wagner stated that he has had to deal with Mr. Maras pro se as well as dealing with five different attorneys who have represented Mr. Maras.

8. The Court finds that at the time of the decree, the trial court had no authority to direct that Ms. Smith receive a direct payment each month from the Police pension plan as her marital share of Mr. Maras' Police pension.

9. The Court finds that the $360 per month ordered to be paid on the $65,000 property division judgment was changed by Judge Hass because of the long period of time it would take to pay that amount out at $360 per month. Mr. Maras did not start making payments of any kind until some nine months after the decree of divorce. Mr. Maras was cited twice for contempt and garnished as a result of not making property division or child support or alimony payments for the nine months subsequent to the decree. The Court further finds that the decree of divorce and the Order Sustaining Plaintiff's Motion to Reconsider, which in effect accelerated payments due by Mr. Maras under the property division judgment, were final orders and were never appealed.

10. The Court finds that since the decree of divorce and up until the time this bankruptcy was filed on March 6, 1998, Ms. Smith and Mr. Maras have both been gainfully employed. Mr. Maras, since his retirement from the Tulsa Police Department, has had the following income: (1) Police retirement, $1,323 per month; (2) VA service connected disability from Viet Nam service, presently $333 per month; and (3) Court Security Officer for United States District Court, Northern District of Oklahoma, $1,900 per month (gross income). The Debtor will be eligible for Army retirement when he reaches age 62. He was a Sergeant First Class in the Army Reserve. His Schedule I reflects gross income of $1,504 and net take home pay of $1,055.15. This was prior to the Debtor's

raise from $9.28 per hour to $11.06 per hour as a Court Security Officer.

11. On July 27, 1992, Mr. Maras executed an assignment to Ms. Smith of $3,978.46 from his account in the Tulsa Police Department Gift Endowment Plan. This money was to be paid to Tilman Pool, law firm of Mr. Maras' attorney for transmittal to Ms. Smith. It appears that this was in response to Ms. Smith's Application for Contempt Citation filed on May 4, 1992.

12. On September 22, 1992, Mr. Maras was cited for contempt by Ms. Smith for nonpayment of child support; support alimony; and property division for the months of August and September, 1992 in the total amount of $1,512.00.

13. On October 9, 1992, there was filed an Amended Application for Contempt for failure of Mr. Maras to pay counseling bills for the benefit of Adam. He was also cited for failure to pay other medical bills for the child.

14. On December 7, 1992, a Second Amended Application for Contempt was filed against Mr. Maras for additional amounts of child support, support alimony and property division subsequent to September, 1992, or a total for all obligations due as of December 7, 1992 of $4,589.37.

15. In response to Ms. Smith's filing a Second Amended Application for Contempt Citation, the Debtor executed an assignment in the amount of $4,589.37 from the Tulsa Police Department Gift Endowment Plan.

16. On January 29, 1993, a Journal Entry of Judgment was entered in the divorce case awarding Ms. Smith a judgment of $2,500 for attorney fees and costs, execution to be stayed for 90 days.

17. On January 29, 1993, Mr. Maras and his attorney, Mr. Pool, appeared before Judge Hass and agreed that a purge fee could be entered against Mr. Maras in the amount of $3,023.37. The purge fee was to be paid at $100 per month. The purge fee was to be paid in addition to the $756 per month that he still owed Ms. Smith pursuant to the decree. These payments were a condition to Mr. Maras avoiding the serving of a 90 day jail sentence which was ordered by the Court on December 17, 1992. The serving of this jail sentence was stayed by the Court pending Mr. Maras making the payments as agreed. Also, at the December 17, 1992 hearing, Ms. Smith was granted a judgment on arrearages against Mr. Maras in the amount of $4,589.37. Mr. Maras was also ordered to take part in parent counseling.

18. On May 13, 1993, Mr. Maras filed a Motion with the divorce court to have his support alimony and child support reduced because of certain alleged changes in his financial circumstances.

19. On April 17, 1996, Mr. Maras filed, through his attorney, Mr. Pool, a Motion to change the physical custody of Adam from Ms. Smith to Mr. Maras. As a result of this Motion to modify custody, by agreement, the custody of Adam was transferred to Mr. Maras on a trial basis from May 31, 1996 until at least June 1, 1997.

20. On October 31, 1997, Mr. Maras, through his new attorney, Stanley Monroe, asked the court to modify the decree of divorce to reduce Mr. Maras' monthly property division payment to Ms. Smith and for the court to further consider entering an order requiring Ms. Smith to pay child support payments to Mr. Maras as long as he had physical custody of Adam. On December 17, 1997, Ms. Smith filed an Application for Contempt Citation. The arraignment on the contempt citation was set for January 16, 1998. Mr. Maras' Motion to Modify was dismissed on December 24, 1997 and he was given 15 days to file an Amended Motion. On January 23, 1998, Mr. Maras appeared at his contempt hearing with new counsel, Mr. Frank Lockhart. He entered a not guilty plea. On February 13, 1998, Mr. Maras appeared for the nonjury trial on the citation with his attorney, Mr. Larry Wagener. On February 24, 1998, Mr. Maras filed a Motion for Continuance of the contempt and demanded a jury trial. On February 27, 1998, the matter came on for hearing. Mr. Grundy appeared for Ms. Smith and Mr. Gomez appeared for Mr. Maras. The matter was continued to March 9, 1998 for jury trial on the contempt. On March 9, 1998, the jury trial was stricken by agreement of the parties due

**700**

to the fact that a bankruptcy had been filed by Mr. Maras. The jury trial on the contempt citation and Mr. Maras' Motion to Modify the decree have all been stayed because of this bankruptcy proceeding.

21. Mr. Lonnie Eck, Chapter 13 Trustee, stated to the Court that there would not be a burden imposed on the Trustee in administering this case. The Trustee took no position and offered no opinion whether the Plan was filed in good faith.

22. This Court finds, and the divorce court so held, that the property division judgment awarded to Ms. Smith is not modifiable, either upward or downward under Oklahoma law.

23. Ms. Smith has filed a proof of claim in the bankruptcy stating that she has an unsecured claim against Mr. Maras in the amount of $66,480.95. This amount represents all monies due and owing that have been reduced to judgment as well as the future monies due Ms. Smith which have not been paid. Mr. Swinson and Mr. Poston stipulated to the Court that the amount presently due and owing on the proof of claim as of October 1, 1998 is approximately $30,000.

24. The Court finds that neither Ms. Smith nor Mr. Maras has remarried.

25. The Court further finds that neither Ms. Smith nor Mr. Maras have any serious health problems that would preclude either of them from continuing full-time employment.

26. Mr. Maras submitted Debtor's Exhibits No. 1 and 2 which contain correspondence between Mr. Wagner and Mr. Monroe pertaining to the settlement of the divorce action. The Court finds that Exhibits 1 and 2 are irrelevant and of no probative value and, therefore, will not be considered by the Court. The previous admission of these exhibits is therefore vacated.

27. Mr. Maras voluntarily retired from his part-time service in the Army Reserve because he could no longer physically handle the job.

28. The Court finds the last time Mr. Maras made any type of payment to Ms. Smith was in late 1996 or early 1997.

29. Mr. Maras purchased a home for $65,000 in December, 1995 and Adam moved in with him in May, 1996. Mr. Maras has a house payment and a car payment. The car payment is being paid through the Plan.

30. Mr. Maras stated the reason he filed bankruptcy was that, because of his age, he could probably not get a better paying job. He has been unable to pay all of his bills and is unable to afford an attorney to represent him.

31. Mr. Maras proposes to pay $608 per month under the Plan. He has recently had a $90 per month increase in his police pension which is not included in the Plan payment. He says he cannot pay all of his bills and be able to pay the $700 per month property division payment. Under the proposed Plan, Mr. Maras proposes to pay 21 percent to the unsecured creditors, which includes the past arrearages reduced to judgment and current and future property division payments to Ms. Smith.

32. Adam works part-time at Southern Hills Golf Club as a caddy and pays his own car insurance and expenses. Adam's car is being paid for by his maternal grandparents.

33. In his monthly budget, Mr. Maras has budgeted $250 per month for health insurance. The Court finds this statement of the Debtor is not truthful. The Debtor has not had health insurance since 1993 or 1994 and his statement to the Court that he put this expense in the budget because he was trying to obtain a health plan defies credibility.

34. The Court finds that Mr. Maras' monthly living expenses have increased substantially since he purchased the house. By his own election, he also pays $313 per month for Adam's private schooling. Since he has had physical custody of Adam, he has not had to make the $291 monthly child support payment he was obligated to pay when Adam was in his mother's custody. Mr. Maras is 50 years of age and he can start drawing his Army retirement in 12 years, which he estimates will be around $200 to $300 per month.

### JURISDICTION

This Court has jurisdiction pursuant to 28 U.S.C. §§ 1334 and 157(b)(2)(I).

## CONCLUSIONS OF LAW

■ A. In order for a Chapter 13 Plan to be confirmed, it must be proposed in good faith and not by any means forbidden by law. 11 U.S.C. § 1325(a)(3).

■ B. The burden of proof to obtain confirmation of the plan is on the proponent. *Lincoln v. Cherry Creek Homeowners Ass'n (In re Lincoln)*, 30 B.R. 905, 909 (Bankr. D.Colo.1983); *see also, In re Harrison*, 203 B.R. 253, 255 (Bankr.E.D.Va.1996); *In re Standfield*, 152 B.R. 528 (Bankr.N.D.Ill. 1993). The Tenth Circuit has adopted the criteria which the Eighth Circuit has considered as relevant to a determination of good faith. These factors were listed in *United States v. Estus (In re Estus)*, 695 F.2d 311, 317 (8th Cir.1982) and adopted by the Tenth Circuit in *Flygare v. Boulden*, 709 F.2d 1344 (10th Cir.1983), as follows:

(1) The amount of the proposed payments and the amount of the debtor's surplus.

The Court finds that Mr. Maras has padded his monthly expenses by the $250 for health insurance. Even though he omitted the monthly payment to the private school, that is a voluntary payment that he makes and is not required by any Court Order. Mr. Maras' monthly expenses have substantially increased after he moved out of his apartment and purchased a home. This was also a voluntary act on his part. The Court finds that his unwillingness to pay Ms. Smith child support, support alimony and property division began long before he purchased the home and gained physical custody of Adam. The Court therefore finds that there is a sufficient surplus in the Debtor's budget to pay a greater portion of the obligations due his former wife.

(2) The debtor's employment history, ability to earn and likelihood of future increases in income.

The Court finds that Debtor has had uninterrupted employment for virtually all of his adult life. There was intermittent employment by him the first few years after his retirement from the Tulsa Police Department in 1989. In spite of the fact that the Debtor draws permanent disability from the VA, he does have the ability to earn, including his two pensions, approximately $2,700 per month. Since his increase in pay to $11.06 per hour as a Court Security Officer in October, 1997, which was an hourly increase of $1.78, the Court finds that any increases in pay by Mr. Maras in the future will probably be slight, as long as he continues in his present position.

(3) The probable or expected duration of the plan.

■ The present Plan is for 36 months. Ordinarily, a Chapter 13 plan is for 36 months; however, the court may approve a longer period not to exceed sixty (60) months. 11 U.S.C. § 1322(d). "Although good faith does not require the debtor to propose a sixty month plan, 'the length [of the plan] is relevant as it relates to the debtor's state of mind'." *In re Jones*, 119 B.R. 996, 1003 (Bankr.N.D.Ind.1990) (quoting *In re Belt*, 106 B.R. 553, 569 (Bankr.N.D.Ind. 1989)). The Court finds there is no justification for the Plan to be only 36 months. This reveals Debtor's underlying intention to be relieved of paying the debts owed to Ms. Smith.

(4) The accuracy of the plan's statements of the debts, expenses and percentage repayment of unsecured debt and whether any inaccuracies are an attempt to mislead the court.

The Court has previously found that the Debtor intended to mislead the Court by including an item for health insurance payment of $250 per month. Although he did not include the private school payment in his budget, as the Court mentioned earlier, this is a payment that the Debtor voluntarily makes. The house payment and associated house expenses and insurance paid by the Debtor are a result of his desire to have his son move in with him. Although commendable, this was a decision to incur new debt made by the Debtor while he knew he was still under a Court order to make child support, support alimony and property division payments to his former wife.

(5) The extent of preferential treatment between classes of creditors.

The Court finds no preferential treatment.

(6) The extent to which secured claims are modified.

The only secured claim modified is a claim by Circuit City which has been modified from $1,200 to $500.

(7) The type of debt sought to be discharged and whether any such debt is non-dischargeable in Chapter 7.

■ The unsecured debts sought to be crammed-down in this matter total $76,702 according to Debtor's Schedule F. The principal creditor is Jana Smith, in the amount of $65,000. The Court has previously made a finding that this amount as of the date of this hearing owed to Ms. Smith was approximately $30,000. This amount represented delinquent property division payments to time of filing plus arrearage for child support, support alimony and property division which had previously been reduced to judgment. In addition, the other unsecured debts consist of $4,200 credit card; $7,500 Nanci Corp. judgment; and unknown amounts that may be due Ms. Smith's attorney and Mr. Maras' attorney. The court, in *In re Todd,* 65 B.R. 249, 251–52 (Bankr.N.D.Ill.1986), stated, with which this Court agrees, that the debtor should make a substantial effort to pay creditors, especially those obligations which are dischargeable under Chapter 13 and nondischargeable under Chapter 7. The court in *Todd* noted:

It is enough that the debt be potentially nondischargeable in a Chapter 7 proceeding. The issue of dischargeability in Chapter 7 need not, and cannot, be litigated to conclusion in every Chapter 13 confirmation proceeding. Where significant claims involve conduct that would otherwise raise serious Chapter 7 dischargeability issues, however, the quantity of that conduct is part of the "totality of circumstances" which must be weighed, with other factors, in assessing the debtor's good faith under Chapter 13.

*Id.* at 254 n. 3 (citing *Neufeld v. Freeman,* 794 F.2d 149 (4th Cir.1986)).

(8) The existence of special circumstances such as inordinate medical expenses.

The Court finds there are none.

(9) The frequency with which the debtor has sought relief under the Bankruptcy Reform Act.

The Court finds, according to Debtor's testimony, that this is the only time that he has filed bankruptcy.

(10) The motivation and sincerity of the debtor in seeking Chapter 13 relief.

Despite the Debtor's testimony, the Court finds that the sole motivation for the Debtor filing this bankruptcy is to avoid paying his former wife the past due and future monies owing to her. The Court finds that the judgment of Nanci Corp. and the credit card debt were not creditors that were pursuing collection efforts against Mr. Maras that might have forced him into bankruptcy. The Court finds that this bankruptcy filing was precipitated by the certainty that the Debtor was going to jury trial on the contempt charge. In considering the Debtor's live testimony for truthfulness and credibility, and in light of the Debtor's past track record of losing almost all actions filed against him in the divorce case, it is more likely than not that the Debtor will be found guilty of contempt in the divorce court which is stayed. This Court makes no finding as to whether Ms. Smith might be ordered to pay child support to Mr. Maras while Adam is in his custody. Of course, if he prevails, then this would increase Mr. Maras' monthly disposable income and would help him make the property division payments. Furthermore, Adam Maras is a junior in high school and therefore, Mr. Maras will not be required to pay any private school tuition or child support after the next two years. The parties both testified Adam would probably get an athletic or academic scholarship to college. Thus, in the next two years, the Debtor's disposable income will increase.

(11) The burden which the plan's administration would place upon the trustee.

As previously stated by the Trustee, the Court finds that there would be no burden

placed upon the Trustee to administer this case.

 Applying the *Flygare* factors, this Court finds that this Plan was not proposed in good faith.

IT IS THEREFORE ORDERED that confirmation of the Chapter 13 Plan is **denied**.

IT IS FURTHER ORDERED that the Debtor is allowed to submit an Amended Plan, consistent with this Order, **within twenty (20) days from the date of the entry of this Order.**