**In re Larry Wayne SORRELL and Carla Jean Sorrell, Debtors.**

**No. 02–28611.**

United States Bankruptcy Court, D. Utah.

Nov. 6, 2002.

**800**

David T. Berry, Berry & Tripp, P.C., Salt Lake City, UT, for the Debtors.

Michael N. Emery and Wayne Z. Bennett, Richards, Brandt, Miller & Nelson, Salt Lake City, UT, for the Mancos Valley Bank.

Duane H. Gillman, McDowell & Gillman, P.C., Salt Lake City, UT, Chapter 12 Trustee.

## MEMORANDUM DECISION

WILLIAM T. THURMAN, Bankruptcy Judge.

The Debtors' request for confirmation of their Chapter 12 plan of Reorganization (the "Plan") came on for hearing before the Honorable William T. Thurman on October 23, 2002 ("the Hearing"). David T. Berry appeared representing the Debtors, Michael N. Emery appeared on behalf of Mancos Valley Bank and Duane H. Gillman appeared representing himself as the Chapter 12 Trustee. After hearing evidence and argument thereon, and based on the same, the Court makes and renders this Memorandum Decision.

## FACTUAL BACKGROUND

The Debtors are residents of Monticello, Utah. Mr. Sorrell has been a farmer for the better part of the last twenty years. Mrs. Sorrell has worked on the farm, but at the present time, and for the last two to three years, has been employed as a loan officer for the Farm Service Agency in Monticello. Evidence produced at the Hearing in the form of testimony and the year 2001 personal tax return of the Debtors, indicated that the Debtors received more than 50% of their income from farming operations during the year 2001. The Debtors filed for relief under Chapter 12 on May 24, 2002. They had previously filed for relief under Chapter 11 on December 5, 2001 which was subsequently dismissed pursuant to a motion filed by the United States Trustee. That case was dismissed by order dated May 22, 2002.

The Debtors have owned two separate parcels of real estate that have been farmed in the past. One parcel is located in the southwestern part of Colorado, in Cohone County. This is commonly referred to as the Cohone Farm. It consists of approximately 504 acres and has been primarily used as an alfalfa farm. Associated with that farm are a sprinkler, a pivot and side roll, planting and harvesting equipment and various items of farm related equipment, buildings, vehicles and water rights provided by a separate water district. The other parcel of land consists of approximately 320 acres located near Monticello, Utah which is located in southeastern Utah. This farm is referred to as the Monticello Farm. The Debtors currently reside on the Monticello Farm. The Monticello Farm has, in the past, been used for growing some pasture grass, wheat and some oats, but at the present time, it is used as pasture, although the Debtors intend to grow the other products as well. The Debtors also own fifteen head of cows along with five heifer calves, eight steer calves and one yearling bull. The calves were born in February, 2002.

The Debtors have cared, maintained and fed the cattle during the last ten months primarily from resources they purchased with funds generated from non-farm employment. On May 24, 2002, the Debtors had approximately 50 tons of hay on the Monticello Farm which was purchased off site and is being used to feed the cattle.

The Debtors maintain certain items of farm equipment on the Monticello Farm, including a John Deere double disc planting drill, a Case Backhoe, John Deere 4630 Tractor, a Bush Hog, and other miscellaneous hand and other tools and equipment. Finally, a 4800 Heston Bailer was transported to Nevada in anticipation of a sale.

The Debtors' secured debt structure includes three farm real estate loans from Mancos Valley Bank of Colorado (the "Bank"). These loans are all cross collateralized with a balance on May 24, 2002 of $669,712.08. The Bank also has several other smaller loans which secured all equipment, inventory, livestock and their proceeds covering items and livestock located either in Colorado or Utah (the "Personal Property Loans"). The balance of these other loans, all cross collateralized with each other, was $94,528.53 on the date of the petition. All equipment subject to the Personal Property Loans is located either on the Cohone or the Monticello Farm, with the exception of a Heston bailer which was transported to Nevada in anticipation of a sale.

The Debtors' remaining secured debt consists of, (1) a purchase money security interest in a Heston mower in favor of Agco with a balance claimed of approximately $25,000; (2) a lease with John Deere on another tractor; (3) a lien in favor of the DC Credit Union on a Dodge Truck; (4) a lien in favor of Key Bank on a Nomad trailer; and (5) a lien in favor of the Delores Water Conservancy District in Colorado securing a claim of $14,219.84.

In addition to the evidence of secured claims listed above, the Debtors Schedules were admitted into evidence.[1] Schedule F reflects approximately $90,000 in unsecured claims (not including any deficiency from a secured claim). Schedule E, listing priority claims, reflects zero owing.

The Debtors have proposed a plan to treat both the unsecured and secured claims. The Debtors' plan proposes a mixture of surrendering certain assets and keeping the rest subject to certain modified payment terms. The plan proposes to surrender the Cohone Farm, valued by the Court at a prior hearing at $596,000, to the Bank. The Debtors seek to retain the Monticello Farm and pay the remaining balance, after credit for the $596,000 value of the Cohone Farm surrendered (approximately $669,712 plus accrued interest and fees, less $596,000), or approximately $113,000 for the purpose of this hearing, amortized over twenty years at 6.9% interest. The contract rate of interest on the farmland loans is greater than 6.9%. Additionally, the Debtors propose to surrender all farm equipment and related items on the Cohone Farm to the Bank for values also found by the Court at a prior hearing. The water rights are to be surrendered to Delores Water Conservancy District. The Debtors propose to surrender the Heston mower to Agco in full satisfaction of the Agco claim, but propose to keep the John Deere Tractor, the Dodge truck and the Nomad trailer and pay the agreed amounts through the plan.

As part of their treatment of the Bank's Personal Property Loans, the Debtors propose to deliver cash to the bank representing sale proceeds from cow sales that occurred during the prior Chapter 11 case in the amount of $4,756.48; surrender and or sell ten cows and the thirteen calves (some immediately and some in 2003) and retain the yearling bull and five cows for breeding purposes; and rebuild the herd. The proceeds from the cow sales and calf sales will be paid to the Bank upon receipt or no

---

1. The parties stipulated that items admitted into evidence in any of the prior hearings held in the case, are also evidence for purposes of confirmation.

later than December 15, 2002 for the calves and September 15, 2003 from the cows. The Debtors also intend to sell the Heston bailer in Nevada for $3,500 and deliver its proceeds to the Bank. After such contemplated sales and payments to the Bank, the remaining secured portion of the Bank's Personal Property Loans claim is reduced to $24,865 to be paid at 6.9% interest per annum over 5 years. Finally, the Debtors propose to retain all Monticello Farm related equipment.

In order to accomplish this creditor treatment, the Debtors' Plan proposes monthly payments of $1550 (orally increased to $1565 at the Hearing) to the Chapter 12 Trustee to pay unsecured claims over five years approximately 10% of their claims. The Plan proposes a fifty month amortization of the Bank's Personal Property Loan claim to be paid by the Trustee from the funds collected from the Debtors. The monthly payment of $1565 would be used to pay the administrative claims first, then the secured claim of the Bank relating to the Personal Property Loans, with the balance going to the unsecured creditors pro rata. Additionally, the Debtors propose to amortize the balance owing to the Bank on the farmland loans as indicated above, now proposed to be paid at the rate of $860 per month, payable quarterly, to satisfy the $113,000, or whatever amount is finally allowed. The Debtors clarified at the Hearing that the terms and conditions of the trust deed securing the obligation on the Monticello Farm and the security agreements' terms and conditions on the livestock, equipment, inventory and proceeds would remain intact, except as specifically modified by the Plan.

Although, according to the Debtors' calculations, the balance owing to the Bank on the farmland loan is approximately $95,000, they did not include post-petition interest and fees. The Bank timely filed a proof of claim that has not been objected to and includes accruing interest. Using the Bank's proposed claim including accrued interest to the date of the Hearing less the $596,000 value of the Cohone Farm, the secured balance on the Monticello Farm is approximately $113,000. At the Hearing, the Debtors agreed to treat this $113,000 as allowed for confirmation purposes but reserve their right to object to the claim amount in the future. The Debtors also orally clarified at the Hearing, that they intend, and that the Plan will include a provision, that the Bank retains its right to credit bid pursuant to § 363(k).

A significant component of the Plan provides that the Debtors dedicate their net disposable income over the next five years to payments to the Trustee for eventual payment to creditors. The source of that income is as follows: (1) Mrs. Sorrell's contribution will come exclusively from her salary at the FSA; and (2) Mr. Sorrell's contribution from a variety of sources including a Veterans Administration disability monthly payment, some government farm subsidies and the bulk coming from income generated as a heavy equipment operator for a construction company during seven months of the year. Some calf crop is intended to be liquidated as well. The Debtors also testified that should any cash crops be grown on the Monticello Farm, that cash would also be used to help fund the Plan.

## DISCUSSION AND RULING

After the Plan's initial filing, three creditors objected to confirmation. After the initial hearing on confirmation held September 26, 2002, all of the objections were resolved except the objection filed by the Bank. The treatment of the other secured creditors' claims have either been agreed

to or otherwise appear reasonable under the circumstances and their treatment will not be addressed. The Bank, however, continues to object to the Plan. The Bank claims several bars to confirmation which are summarized in three categories: lack of good faith, lack of feasibility and that the Debtors do not qualify as farmers with regular income as contemplated by the Bankruptcy Code.[2]

2. Several interesting aspects of the proposed Plan were resolved by stipulation of the parties that will not be addressed in the body of the decision but gave the Court pause. First, the parties agreed that the Trustee is entitled to a commission on not only distributions made by him from the cash received from the Debtors, but also direct pay amounts from the Debtors to the Bank at the rate of 5% of such amounts throughout the five-year proposed plan duration. The Trustee will not receive any commission based on the value of the assets surrendered in satisfaction of claims including the Cohone Farm. The Trustee argued that he would normally be entitled to a higher commission of something approximating 10% as set forth in 28 U.S.C. § 586(e)(2), but in an effort to compromise and settle this issue, he agreed to a 5% commission as set forth above. Accordingly, the Court believes this issue should be addressed.

Absent the compromise, including the reduction from 10% to 5%, the Court would not be inclined to allow the Trustee to receive a commission from direct pay amounts but from only those amounts actually received and disbursed by the Trustee. There is a split in case law as to the treatment of monies paid directly to the Creditors, as recognized by the Tenth Circuit Court of Appeals in *Foulston v. BDT Farms Inc. (In re BDT Farms, Inc.)*, 21 F.3d 1019 (10th Cir.1994). *See e.g., Michel v. Beard (In re Beard)*, 45 F.3d 113 (6th Cir. 1995); *Wagner v. Armstrong (In re Wagner)*, 36 F.3d 723 (8th Cir.1994); *Fulkrod v. Savage (In re Fulkrod)*, 973 F.2d 801 (9th Cir.1992). While the Court in *BDT* acknowledged the split in opinion, it did not decide the issue explicitly. In the opinion, however, in addressing a separate issue, the Court of Appeals held that, "the standing trustee is entitled to collect a percentage fee of all monies *he receives* from the debtor ..." *Id.*, at 1023 (emphasis added). This holding is consistent with both the plain meaning of the statute and other case law.

28 U.S.C. § 586(e)(2) provides that standing trustees "shall collect such percentage fee from all payments received by such individual under plans in cases under chapter 12." The Court believes this language is clear and unambiguous. With this clear language, it seems Congress has precluded a standing trustee from collecting or assessing a ten percent fee on monies not actually received by the trustee. This would include payments made directly by the debtor. The Court's interpretation of this statute is also that of the Executive Office of the United States Trustees. Shortly after the proposed changes to § 586 were announced, the director and counsel for the Executive Office of the Unites States Trustee released a memorandum regarding the changes to the statute. It reads in part,

This rather crucial section was changed. The paragraph now reads, in pertinent part: "Such individual [standing trustee] shall collect such percentage fee from all payments *received by such individual* under plans in the cases under chapter 12 or 13 of title 11 for which such individual serves as standing trustee." The underlined words were added to the previous version of that paragraph. The added *language clearly precludes* the standing trustee from *receiving the statutory percentage fee on payments not actually received by the standing trustee.*

*In re Erickson Partnership*, 77 B.R. 738 (Bankr.D.S.D.1987), *rev'd on other grounds*, 856 F.2d 1068 (8th Cir.1988), (quoting counsel's memorandum to standing trustees).

The amendment to § 586(e) appears to modify and trump the holding in the case of *In re Case*, 11 B.R. 843 (Bankr.D.Utah 1981), wherein the court held in the context of a Chapter 13 case that when a secured claim is provided for in the plan, whether paid directly by the debtor or to the trustee, the payments are subject to the trustee's statutory fee.

In addition, the parties stipulated to the interest rate proposed by the Debtors to be paid on the balance owing to the Bank on the farmland loan. The plan proposed 6.9% interest, less than the contract rate of interest. No evidence was presented on this issue which the Court found interestingly absent from the evidence until the parties advised the Court of their stipulation near the conclusion of the Hearing.

## I. FAMILY FARMERS WITH REGULAR INCOME

■ The gravamen of the Bank's objection that the Debtors do not qualify as farmers with regular income stems from the fact that the Debtors' Plan cannot be financed from farm income. Indeed, Exhibit 2, received at the Hearing, indicates that the Debtors can only generate $19 per month profit from their farming operations. The balance of funds needed to live and pay the obligations under the Plan must come from income generated from other sources. The Bank argued that Congress implicitly intended that Chapter 12 farm plans should be funded by reorganizing the farming operations, not from other sources and that farms kept as "hobbies" should be discouraged where they can not pay for themselves. The Bank cites no case law to support this position.

The sections of the Bankruptcy Code relevant to this objection are §§ 101(18) and (19) the definition of family farmers and § 109(f) which read as follows:

"[F]amily farmer" means (A) individual or individual and spouse engaged in a farming operation whose aggregate debts do not exceed $1,500,000 and not less than 80 percent of whose aggregate noncontingent, liquidated debts ... on the date the case is filed, arise out of a farming operation owned or operated by such individual or such individual and spouse, and such individual or such individual and spouse receive from such farming operation more than 50 percent of such individual's or such individual and spouse's gross income for the taxable year preceding the taxable year in which the case concerning such individual or such individual and spouse was filed;

11 U.S.C. § 101(18).

"[F]amily farmer with regular annual income" means family farmer whose annual income is sufficiently stable and regular to enable such family farmer to make payments under a plan under chapter 12 of this title;

11 U.S.C. § 101(19).

Only a family farmer with regular annual income may be a debtor under chapter 12 of this title.

11 U.S.C. § 109(f).

The Court is convinced from the evidence that the requisite 50% of the Debtors' gross income for 2001 came from farming operations. This is reflected by their 2001 tax return which was placed into evidence. The Court is also convinced that the Debtors have carried their burden to establish that they have reasonably stable and regular income. The question then arises, as suggested by the Bank, that since the income is not coming from the farm, do the Debtors qualify as farmers with regular income? Without much if any case law precedent on this issue, the Court must interpret the plain meaning of §§ 101(19) and 109(f) and references to other farm related sections and their intent. There is some help from the Congress on this issue. Legislative history to § 101(20) indicates Congress intended the word farmer to have the broadest application. *See* 124 Cong. Rec. H11,090 (daily ed. Sept. 28, 1978); S17,406–7 (daily ed. Oct. 6, 1978). Other code sections suggest that farmers receive favorable treatment, including § 1208(a) and (b) which states any waiver of the right to convert or dismiss a case under Chapter 12 is unenforceable. With this overlay of intent, coupled with the plain reading and meaning of § 101(19), the Court cannot conclude that Congress intended that Chapter 12 plans must be primarily or substantially funded from farming operations. If Congress intended that, it could have so stated. It did not. Accordingly, the Court finds that the Debtors are Family Farmers with regular

income and qualify in every way for Chapter 12 relief.

## II. GOOD FAITH

■ Good faith is not defined in the Bankruptcy Code. However, the Code requires the Court to find good faith in order to confirm a Chapter 12 plan. Section 1225(a)(3) specifically provides that a plan may only be confirmed if it has been proposed in good faith. The Tenth Circuit Court of Appeals (the "Tenth Circuit") has given some guidance regarding the issue of good faith, however, but in the context of a Chapter 13 case. The requirement of proposing a plan in good faith in a Chapter 12 case is similar to that which is required in a Chapter 13 case. In the context of a Chapter 13 case, the Tenth Circuit has stated:

> We adopt the factors the Eighth Circuit listed as relevant to a determination of good faith. We reproduce them here for guidance on remand:
>
> "(1) the amount of the proposed payments and the amount of the debtor's surplus;
>
> (2) the debtor's employment history, ability to earn and likelihood of future increases in income;
>
> (3) the probable or expected duration of the plan;
>
> (4) the accuracy of the plan's statements of the debts, expenses and percentage repayment of unsecured debt and whether any inaccuracies are an attempt to mislead the court;
>
> (5) the extent of preferential treatment between classes of creditors;
>
> (6) the extent to which secured claims are modified;
>
> (7) the type of debt sought to be discharged and whether any such debt is non-dischargeable in Chapter 7;

> (8) the existence of special circumstances such as inordinate medical expenses;
>
> (9) the frequency with which the debtor has sought relief under the Bankruptcy Reform Act;
>
> (10) the motivation and sincerity of the debtor in seeking Chapter 13 relief; and
>
> (11) the burden which the plan's administration would place upon the trustee."
>
> This list is not exhaustive, and the weight given each factor will necessarily vary with the facts and circumstances of each case.

*Flygare v. Boulden* 709 F.2d 1344, 1347–48 (10th Cir.1983); *see also Mason v. Young (In re Young)*, 237 F.3d 1168, 1174–75 (10th Cir.2001) (affirming use of *Flygare* factors in determining good faith and that weight given to any factor varies with the facts and circumstances of the case).

■ The Court believes that an analysis of these factors is useful to the analysis of whether this Chapter 12 plan has been proposed in good faith. The Court will address each category:

**(1) The amount of the proposed payments and the amount of the debtor's surplus.**

The amount of the monthly payment to the Trustee is $1565 which includes amounts dedicated for the payment of administrative claims, the personal property secured claim of the Bank, claims of other secured creditors and unsecured claim holders. The Debtors also propose a direct payment to the Bank on the farmland loan in the amount of $860 per month. These are not insignificant amounts. However, the return to unsecured creditors is fixed at approximately 10%. In response to questioning by the Chapter 12 Trustee, Mr. Sorrell testified at the Hearing that the Debtors could "squeeze" down some of their expenses from those set

forth on Schedule J and increase their payment to the Trustee by an additional $500 per month. Counsel for the Debtors attempted to rehabilitate the Debtors on subsequent cross examination by having Mr. Sorrell state that he really didn't understand the Trustee's questioning and gave another version of what expenses the Debtors could reduce. The Court heard the testimony of both lines of inquiry. The Trustee was clear and unequivocal in his examination. Mr. Sorrell unequivocally stated that he could put the proposed $250 per month for attorneys fees from Schedule J toward payment to the Trustee and then slim down other proposed monthly expenses which recently showed up on his amended budget on Schedule J.

In addition, when a former budget dated October 7, 2002 was compared to the new budget dated October 23, 2002 at the Hearing, it was apparent that the Debtors had increased the amount of several previously budgeted monthly items, including food ($300 to $425), transportation ($200 to $350) and several others having a collective effect of increasing the budgeted expenses from $1,781 to $3,627.[3] To confuse the issue further, it is noted that the Debtors filed an initial Schedule J on June 6 which showed monthly expenses of $2,177. This raises concerns with the Court that one of the budgets was incorrect. While Mr. Sorrell testified that the October 23 budget was the correct one, the factors which lead to the creation and filing of the October 7 budget, just two weeks earlier, do not appear to have changed materially.

In addition, the inclusion of payment for attorneys fees in the October 23 budget gives the Court greater concern. Attorneys fees for Debtors' counsel are clearly an administrative expense. They may only be paid after notice and a hearing and specifically approved by the Court. Neither of these requirements have been met. Federal Rule of Bankruptcy Procedure 2002 requires at least a twenty day notice on a fee application and § 330 specifically provides that the Court must approve allowance and payment of any fees. The Plan may not be confirmed with attorneys fees being paid directly from the Debtors to their counsel as currently proposed.

In addition, the Court believes that the other budgeted items are at least $250 too high as per Mr. Sorrell's testimony. Using the October 7 budget as a touchstone, it would appear that the Debtors purposefully increased their budgeted expenses to reduce their net disposable income and thereby maneuver in such a manner the amount to be paid to the Trustee through the plan. The Court believes that such maneuvering should not be allowed on the eve of the confirmation hearing and that if the Debtors have a basis for filing a budget less than three weeks before confirmation and verify its accuracy by signing a perjury statement, it should be given some deference. Accordingly, the Plan may not be confirmed without increasing the payment to the Trustee for this plan's distribution by $500 ($250 for the proposed attorneys fees direct pay and an additional $250 from reducing other budgeted items from the October 23 budget). Without such, the Court concludes that the Debtors are not contributing all of their projected disposable income to the Plan and the Plan fails to meet the additional requirement of § 1225(b)(1)(B).

---

**3.** Part of the increased expenses include a direct payment of $250 per month for attorneys fees and a proposed payment of $805 per month to the Bank on the farmland loan. With these accounted for, the Debtors added items or increased existing budgeted items by $1091 per month.

**(2) The debtor's employment history, ability to earn and likelihood of future increases in income.**

This appears to be a non factor.

**(3) The probable or expected duration of the plan.**

The code provides that a Chapter 12 plan may not exceed three years unless the Court finds cause for extending the same. The Debtors are proposing a five year plan with payments through the Trustee and then a twenty year amortization to the Bank on its farmland loan. With a five year plan, the Court would expect that the Debtors are paying all of their projected disposable income to the Trustee throughout the entire five years. Coupling this with the first *Flygare* issue, the Court believes that without an increased payment to the Trustee, the plan should not be extended beyond the three year statutory period.

**(4) The accuracy of the plan's statements of the debts, expenses and percentage repayment of unsecured debt and whether any inaccuracies are an attempt to mislead the court.**

The Debtors have filed three budgets on Schedule J. Each budget came with the attestation that it was true and correct under penalty of perjury. The practice of filing an amended Schedule J to fit the needs of a particular hearing give the Court concern about the accuracy of the schedules. The Court finds that three budget amendments (Schedules I and J) within a period of five months suggests that either the Debtors really did not know what their expenses were or that they maneuvered the schedules to bring their expenses into line with what they wanted to pay after formulating the proposed plan. This method seems flawed. The budget should dictate the plan, not vice versa. In some circumstances, it is appropriate to amend schedules where new data is ascertained. However, in this case, the Court believes that there was some fine tuning of the budget solely to meet the plan requirements.

**(5) The extent of preferential treatment between classes of creditors.**

This appears to be a non factor.

**(6) The extent to which secured claims are modified.**

The Bank's secured claims are modified significantly—by duration of pay out and interest rate. The Bank stipulated to the interest rate but not the duration. However, no significant objection was made regarding this and the Court is inclined to approve the proposed treatment of this creditor, both as to the personal property and farmland loans.[4]

4. Although the Bank did not strenuously object to the modification of the proposed duration of the loan, the Court undertook an investigation into the appropriateness of such modifications. The duration of the repayment schedule is important. The well-known principle of the "time value of money" dictates that a dollar today is worth more than a dollar tomorrow. A secured creditor, like all creditors, would rather be repaid sooner than later. It would logically follow, then, that a repayment schedule that stretched out the repayment terms beyond that of the original agreement did not provide for the full value of the secured claim. However, as in all "time value of money" problems, there exists a discount rate, which equates the present value of a longer stream of cash-flows to a shorter one. This would imply that, given a proper discount rate, a repayment schedule may be "stretched out" to a duration beyond that of the original agreement.

Other courts considering this question have come to the same conclusion. In *Travelers Ins. Co. v. Bullington*, 878 F.2d 354 (11th Cir.1989), the Court found that a plan's 30-

**(7) The type of debt sought to be discharged and whether any such debt is non-dischargeable in Chapter 7.**

This appears to be a non factor.

**(8) The existence of special circumstances such as inordinate medical expenses.**

This appears to be a non factor.

**(9) The frequency with which the debtor has sought relief under the Bankruptcy Reform Act.**

The Debtors filed a Chapter 11 case once in 2001 and then allowed the same to be dismissed. The Court surmises this was due to the reauthorization of Chapter 12 relief and heard no objections regarding the circumstances of the prior case. Accordingly, the Court concludes this is a non-factor.

**(10) The motivation and sincerity of the debtor in seeking Chapter 13 relief.**

The Court finds the Debtors sincere in their efforts to reorganize.

**(11) The burden which the plan's administration would place upon the trustee.**

There is no evidence extra burdens would be placed on the Trustee to administer this case.

Accordingly, the Court views factors 1, 3 and 4 as bearing on the good faith of the Debtor's plan. As explained below, the Court will not confirm the current plan because of this failure to meet the good

faith requirement, but will allow the Debtors to amend their plan should they so desire, to address the concerns of the Court.

## III.   FEASIBILITY

■ The Bank argues that the Debtors' plan is not feasible and points to the approximately $90,000 in unsecured debt scheduled on Schedule F as one factor. In effect, the Bank argues that by analyzing the nature of the unsecured debt scheduled (i.e. it is composed of a significant amount of credit card debts), the Court should conclude that the Debtors cannot succeed without borrowing significant amounts in the future to meet their projected income and expenses. This point was made by argument only, and no evidence of what type of goods or services were received from the debts scheduled on Schedule F was presented, let alone received by the Court. Further, there was no evidence presented that contravened that presented by the Debtors that they could meet the plan payments. Without some sort of background as to what the charges consisted of and evidence that credit card usage would be probable in the future to meet the Debtors' expenses, the Court cannot make the conclusion that the Debtors cannot otherwise meet the requirement that the plan is feasible.

The Bank also points to the projected farm profit of $19 per month on Exhibit 2 as attached to Schedule I. Although the profits are relatively low, this factor standing alone, does not mean that the plan is not feasible. It appears to the Court that this factor is more applicable to the qualifi-

---

year mortgage schedule for real property did not violate the Bankruptcy Code, and provided for the full value of the secured claim, even though the terms of the original agreement provided for payment over only four years.

Similar conclusions were reached in *In re Mulberry Agricultural Enterprises, Inc.*, 113 B.R. 30, (D.Kan.1990) and *In re Snider Farms, Inc.*, 83 B.R. 977 (Bankr.N.D.Ind.1988).

cation of being a family farmer which has been treated above.

The Bank did conduct examination as to the Debtors' other costs and expenses. The farm budget did not contain references to farm taxes, farming equipment insurance or taxes. However, on Debtors' Schedule J filed on October 23, the Debtors addressed the probable expenses of taxes on their farm, insurance expenses and taxes. Accordingly, the Court cannot find that the Debtors projected income and expenses as filed in the October 23 budget renders the plan infeasible. Accordingly, the Court finds the plan feasible.[5]

## IV. OTHER ISSUES

### 1. Confirmation Within Forty–Five Days of Filing Plan

█ Section 1224 requires that the hearing on confirmation of the plan be concluded within forty-five days after filing of the plan. The plan was filed on August 22, 2002 and forty-five days thereafter is October 7, 2002. A duly noticed and scheduled hearing on confirmation of the plan was held September 26, 2002 but upon the consent of all parties, the Court agreed to treat that initial hearing as a valuation hearing and continue confirmation until October 23, 2002. Section 1224 does provide that the Court may extend the initial forty-five day period for cause. The Court determines that the Debtors presented their plan for confirmation at a properly scheduled and noticed hearing within the allotted forty-five days and that the Court took the matter of confirmation under advisement. The Court concludes that it would be in the best interests of the estate and creditors to extend the time for obtaining confirmation under the circum-

stances of this case which constitutes cause as contemplated by § 1224. The Court therefore extends confirmation of the plan until November 19, 2002 at 2:00 p.m. which is the time that the Court will consider whether the Debtors have amended their plan to adjust for the factors identified by the Court in this ruling. Should the Debtors elect not to so amend their plan, the Debtors will be deemed not to have obtained confirmation of their plan as contemplated by § 1224 within the time allowed.

The Court has addressed the issue of attorneys fees sought by the Debtors. The Court will not approve any attorney fees without a duly scheduled and noticed hearing in compliance with Rule 2002. Further, the Court will not allow any attorneys fees to be paid directly by the Debtors to their attorneys, but only through the Chapter 12 Trustee after the same have been approved and allowed.

### 2. Cram Down on the Bank

█ The plan proposes to pay the secured claim of the Bank in the farmland in Monticello over twenty years with interest at the rate of 6.9% per annum. The Bank has agreed that 6.9% is a reasonable interest rate and it otherwise appears that it has agreed this interest rate complies with the discount rate needed pursuant to § 1225(a)(5)(B). However, the Bank did contend that the length of the term was too long. It contended that the plan took a seven year loan and stretched it out to twenty years. Neither party presented evidence or substantial argument on this issue. The Court is aware of decisions elsewhere in this circuit which have ad-

---

**5.** Elsewhere in this ruling, the Court stated that it will not confirm the plan as currently contemplated without increasing the payment to the Trustee for distribution to creditors.

Should the Debtors elect to make the additional payments to the Trustee, the Court would still find the plan feasible.

dressed this issue of whether loan terms may be extended and at what interest rate within the context of Chapter 13 cases. *See e.g., In re Maras,* 226 B.R. 696 (Bankr. N.D.Okla.1998); *In re Segura,* 218 B.R. 166, 176 (Bankr.N.D.Okla.1998). These cases held that the initial burden is on the Debtor to show that the treatment of a secured claim is appropriate. Once that burden is met, the burden shifts to the creditor opposing that treatment. The Court finds this case law applicable to treatment of secured claims in Chapter 12 as well and applies it to the case at hand. Here, all that has occurred is that the Debtors have placed this proposed treatment in their plan. With the stipulated interest rate, the Court concludes that the Debtors have met their burden and finds no evidence contradicting either the interest rate or the length of the term of the plan. *See also Hardzog v. Federal Land Bank of Wichita (In re Hardzog),* 901 F.2d 858 (10th Cir.1990) (providing that in absence of special circumstances such as the market rate being higher than the contract rate, the bankruptcy court should use the market rate of interest). Accordingly, the Court determines that a 6.9% interest rate on a twenty year payout on this secured claim comports with current market interest rates and meets the requirements of § 1225(a)(5)(B).

### 3. Continuing Security Interest in Cows

■ The Debtors have proposed that they retain the future offspring from the current herd of cows free and clear of the Bank's lien. The Debtors have fifteen cows which, the Debtors agree, are clearly subject to the Bank's lien. The Debtors also have seven steers and eight heifers which were born in February 2002 along with a yearling bull. The Court has previously conducted a hearing on the issue of the breadth of the security interest of the

Bank in these offspring and other collateral. The Court has ruled that the security interest of the Bank did attach to the 2002 offspring. The Debtors now contend that the security interest of the Bank is cut off by the filing of the bankruptcy case on May 24, 2002 under the theory that none of the calf crop expected in 2003 existed as of that date pointing out that there was no evidence presented that any of the cows were pregnant at that time.

Section 552(b) provides that if there is a pre-petition agreement providing for a secured creditor's lien in property and its proceeds or offspring, that security interest in proceeds and offspring continues in such property acquired by the estate after the commencement of the case to the extent provided by such agreement and by applicable nonbankruptcy law, "except to any extent that the court, after notice and a hearing and based on the equities of the case, orders otherwise." It is that last phrase that the Debtors argue give rise to their claim to future offspring. During the course of the Hearing, the Debtors orally modified their plan to provide that the Bank would have a security interest in the 2003 calf crop but none thereafter. The Debtors contend that the "equities of this case" dictate that they should be free from the Bank's lien on future calf crops thereafter on the basis that since the Debtors are feeding the new calves with their own feed and maintaining and caring for the calves, they should have a claim against the collateral pursuant to § 506(c). Section 506(c) allows the Trustee to surcharge collateral for reasonable, necessary costs and expenses of preserving or disposing of the collateral to the extent of any benefit to the secured claim holder. This is a novel theory proposed by the Debtors. The Debtors seem to be implying that since they are doing all the work, they should be free from the secured claims of

the Bank or at least a portion of the Bank's claim. The Debtors seem to be forgetting that they will be receiving a benefit by the sale of cattle in the future by paying the proceeds of the same to the Bank and thereby reducing the secured claim of the Bank. The Court is not inclined to follow the Debtors' suggested theory of eliminating the security interest of the Bank in future calf crops after 2003.

▪ Notwithstanding the Court's inclination, the Court does believe that § 552(b) gives the Court some flexibility in crafting a payment scheme which does address the "equities of the case." The Court finds that the equities of this case are such that should the Debtors elect to increase their monthly payment to the Trustee by the amounts set forth above in the amount of $500 per month, increase the return to unsecured creditors with allowed claims to approximately 20%, recognize the Bank's lien on and pay the Bank all of the proceeds from the 2003 calf crop only and sell ten of the existing cows no later than September 15, 2003, proceeds to the Bank, the equities of the case would allow the Court to approve this treatment of the Bank under § 552(b).[6]

### CONCLUSION

For the foregoing reasons, the Court declines to approve the Plan as it currently reads but will allow the Debtor to amend the Plan as set forth herein and seek confirmation at the time and date indicated on the Court's separate order preliminarily denying confirmation.

**6.** In allowing this treatment, the Court is striking the "proper balance between the rights of the secured creditor and the rehabilitative goals of the Code." *In re Island Helicopter Corp.*, 63 B.R. 515 (Bankr.E.D.N.Y.1986). In interpreting § 552(b), courts have agreed that this is the standard a Court should apply in determining whether secured parties should retain their liens after a bankruptcy petition is filed should the security agreement specify the security interest continues in proceeds or offspring. The Fourth Circuit Court of Appeals has stated:

It appears clear from the legislative history related to § 552 that Congress undertook in

that section to find an appropriate balance between the rights of secured creditors and the rehabilitative purposes of the Bankruptcy Code. The latitude afforded to the bankruptcy court seems to this court to indicate that such a balancing of interests was intended in the framing of § 552.

*United Virginia Bank v. Slab Fork Coal Co. (In re Slab Fork Coal Co.)*, 784 F.2d 1188, 1191 (4th Cir.1986). *See also In re Ledis*, 259 B.R. 472 (Bankr.D.Mass.2001); *Marine Midland Bank v. Breeden (In re Bennett Funding Group)*, 255 B.R. 616 (N.D.N.Y.2000).